OPINION
Plaintiff-appellant Harold G. Rinehart , D.C. aka Harold G. Rinehart, D.C., Inc. appeals from the June 1, 1999, Judgment Entry of the Ashland County Court of Common Pleas.
 STATEMENT OF THE FACTS AND CASE
On or about September 27, 1996, appellant Harold G. Rinehart, D.C. aka Harold G. Rinehart, D.C., Inc. and appellee Robert L. Ross, D.C. entered into a purchase agreement for the sale of appellant's chiropractic practice. Pursuant to the terms of such agreement, appellee agreed to purchase appellant's practice "(assets only), including the professional equipment, business equipment and furniture, patient case files and accounts receivable" for between $169,000.00 and $172,000.00. Appellant was to receive a $25,000.00 lump sum payment from appellee on or before the closing date. The balance of the purchase price was to be paid in monthly installments to appellant as specified under the terms of the purchase agreement. The purchase agreement also contained a non-competition clause providing as follows: "In connection with the sale by Seller [appellant] to Buyer [appellee] of Seller's practice, Seller agrees that he shall not carry on or engage in a private clinical practice of chiropractic within a 50 mile radius from Loudonville, Ohio, for a period of 5 years after the date of the closing date. .". The agreement specified that, of the total purchase price, $75,400.00 was to be paid to appellant for his non-competition clause.
The purchase agreement also provided as follows :
"C. Acceleration of Contract Payments
 In the event of Buyer's failure to make timely payments as required in 3A and B above, Seller may call all outstanding payments due and payable in full within 90 days thereafter. Seller shall call said payments are due and payable by delivering notice of same, in writing, to Buyer. If the Buyer cannot pay the accelerated payment in full in the time provided for herein, then Seller may repossess all patient files for the purpose of resale and recovering and [sic] outstanding balance. Any proceeds from the resale of the patient files that exceed the outstanding balance due from Buyer to Seller shall immediately be delivered to Buyer. If Buyer chooses to only make payments of $3,000.00 for 48 months, interest paid will not be more than $3,000.00 ($1,950.24 to Corporation/$1,049.76 to Harold G. Rinehart."
In accordance with the terms of the purchase agreement, appellee made a down payment of $25,000.00 to appellant in September of 1996. Appellee also made additional payments to appellant totaling $32,750.00. However, after a total of $57,750.00 ($25,000.00 plus $32,750.00) had been paid, appellee ceased making payments to appellant in the fall of 1997 due to financial difficulties. For such reason, appellant, pursuant to a letter to appellee dated October 21, 1997, and in accordance with the parties' purchase agreement, called "for the balance of the Purchase Agreement due as of 10-16-97." Appellant called the balance due after deciding that there was no value to selling the patient files. Transcript of Proceedings at 60. Appellee, in a letter to appellant dated October 28, 1997, responded in part as follows: "After discussion with my attorney, it is my understanding that in the event of default, I am obligated to return your original patient files for purposes of resale or returning to practice. All else is open to negotiation."
Subsequently, appellant, on March 19, 1998, filed a complaint for breach of contract against appellee in the Ashland County Court of Common Pleas. An answer and counterclaim was filed by appellee on April 17, 1998. Appellee, in its counterclaim, alleged that appellant Harold G. Rinehart, D.C. breached the non-competition clause in the parties' purchase agreement by "carrying on and engaging in a private clinical practice of chiropractic within a fifty mile radius from Loudonville, Ohio, less than three years after September 27, 1996." Appellant filed an answer to appellee's counterclaim on May 8, 1998.
Appellee, with leave of court, filed an amended answer and counterclaim on October 20, 1998. In his amended answer and counterclaim, appellee alleged that appellant's claim for money damages was barred by the doctrine of mutual mistake and that, therefore, the parties' purchase agreement should be "rescinded or modified". Appellee further alleged that appellant had fraudulently misrepresented the income and net worth of the chiropractic practice during the parties' negotiations. An answer to the amended counterclaim was filed by appellant on November 9, 1998.
Thereafter, a bench trial was held on April 30, 1999. At the conclusion of the trial, the trial court took the matter under advisement and requested that both parties file proposed findings of fact and conclusions of law. Following the submission of the requested findings of fact and conclusions of law, the trial court, pursuant to a Judgment Entry filed on June 1, 1999, found that the parties were mutually mistaken as to the terms of the purchase agreement and that neither party contemplated the remedy of acceleration by appellant. The trial court, therefore, ordered that the contract between the parties be reformed to "provide the remedy both parties understood to be available when they entered into the agreement is the only appropriate relief." The trial court, in its June 1, 1999, Judgment Entry, specifically ordered as follows:
"10. Therefore, the Court orders the following:
Buyer forfeits all payments made to date ($57,750);
 2) Seller is restored to his prior right to carry on a chiropractic practice anywhere, without any geographic limitation;
 3) Seller is entitled to the return of his patient list (the evidence of which showed this had already occurred);
 4) Seller is further entitled to the return of the furniture, fixtures, equipment, and all other items included in Exhibit A attached to the Purchase Agreement.
 5) The evidence indicates that the items set forth in subparagraph 4) above have been refinanced by the Buyer and are subject to a blanket lien accordingly;
 6) The Court finding this course of action by the Buyer to have been undertaken in good faith, and the Court further finding that no evidence of the value of these items having been presented by either party, the Court therefore provides that this issue shall be resolved by Buyer selecting his option of:
 Causing liens to be removed and delivering same to Seller, or;
 Seller/Buyer to agree to a value; or if they cannot, then;
 An arbitrator/appraiser shall be selected which is agreeable to both parties, to determine in binding fashion, a figure representing the present value of such items. Costs of this procedure to be split equally.
 This entire process to be completed within sixty (60) days of this Decision being filed.
In addition, the trial court dismissed appellee's counterclaim since it found insufficient evidence of fraud by appellant.
It is from the trial court's June 1, 1999, Judgment Entry that appellant now prosecutes his appeal, raising the following assignments of error:
ASSIGNMENT OF ERROR I
 THE TRIAL COURT ERRED, AS A MATTER OF LAW, WHEN IT ALLOWED EXTRINSIC EVIDENCE WHICH CONTRADICTED THE TERMS OF THE PARTIES' PURCHASE AGREEMENT IN VIOLATION OF OHIO'S PAROLE EVIDENCE RULE.
 ASSIGNMENT OF ERROR II
 THE TRIAL COURT ERRED, AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN IT FOUND THAT THE DEFENDANT-APPELLEE HAD PROVEN MUTUAL MISTAKE OF FACT OCCURRED.
 ASSIGNMENT OF ERROR III
 THE TRIAL COURT ERRED, AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN IT REFORMED THE AGREEMENT BETWEEN THE PARTIES IN REFERENCE TO THE FOLLOWING TWO (2) MATTERS:
 A) THE TRIAL COURT ERRED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN IT FOUND THAT THE PARTIES AGREED UPON DEFAULT OF THE DEFENDANT-APPELLEE, THAT DEFENDANT-APPELLEE NEED ONLY RETURN A LIST OF CLIENT NAMES AND ADDRESSES AS WELL AS THE EQUIPMENT THAT WAS TRANSFERRED, AND
 THE TRIAL COURT ERRED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN IT ALLOWED THE DEFENDANT-APPELLEE TO MAINTAIN HIS PRACTICE FOR SEVERAL MONTHS WITHOUT MAKING MONTHLY PAYMENTS TO THE PLAINTIFFS-Appellant.
 I
Appellant, in his first assignment of error, argues that the trial court erred in allowing "extrinsic evidence which contradicted the terms of the agreement in violation of Ohio's parol evidence rule." Appellant specifically contends that, since the parties' purchase agreement was clear on its face as to appellant's remedies in the event of appellee's default, the trial court erred in permitting testimony that there was a mutual mistake as to the same.
Generally, under Ohio law, there is a presumption that the intention of the parties to a contract resides in the language they employ in the agreement. Shifrin v. Forest City Enterprises,Inc. (1992), 64 Ohio St.3d 635. The parol evidence rule prohibits a party from using evidence of "antecedent understandings and negotiations " to contradict or vary the terms of a written contract. Ed Schory Sons, Inc. v. Soc. Nat. Bank
(1996), 75 Ohio St.3d 433,440. However, parol evidence is admissible with respect to issues, including mutual mistake, that go to the very existence of a contract. See, generally, Shifrin,
supra. See also Am Gen. Finance v. Beemer (1991), 73 Ohio App.3d 684. A mutual mistake in the formation of a contract exists when a contract provision is contrary to the understanding of all of the contracting parties. Snedegar v. Midwestern Indemn. Co.
(1988), 44 Ohio App.3d 64, 69. Reformation of a contract based on mutual mistake is permitted only where there is clear proof that the parties to the contract made the same mistake and that both parties understood the contract as the party seeking reformation alleges it ought to have been. Id., citing Merrill v.Hamilton (1982), 9 Ohio App.3d 111, 112. The party alleging mutual mistake has the burden of proving its existence by clear and convincing evidence. See Frate v. Rimenik (1926), 115 Ohio St. 11
and Gen. Tire, Inc. v. Mehlfeldt (1997), 118 Ohio App.3d 109, 115.
In the case sub judice, we find that the trial court did not err in considering parol evidence as to appellant's remedies upon appellee's default. As is stated above, the purchase agreement between the parties provides that upon appellee's default, appellant shall "call all outstanding payments due and payable." If, however, appellee cannot pay the accelerated balance in full, the purchase agreement provides that appellant "may repossess all patient files for the purpose of resale and recovering and [sic] outstanding balance." However, appellee, in his amended answer, alleged that appellant's claim for money damages was barred by the doctrine of mutual mistake. Evidence regarding the parties' understanding of appellant's remedies upon appellee's default was, therefore, admissible pursuant to Shifrin, supra. Moreover, as is set forth in detail below, there was competent and credible evidence in the record as to the existence of mutual mistake. The trial court, therefore, did not err in permitting parol evidence as to the appellant's remedies upon appellee's default.
Appellant's first assignment of error is, therefore, overruled.
 II
Appellant, in his second assignment of error, contends that the trial court's finding that appellee had proven that mutual mistake of fact occurred as to appellant's remedies upon appellee's default was against the manifest weight of the evidence.
We are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck vJeffries (Feb. 10, 1982), Stark App. No. CA-5758, unreported. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence.C.E. Morris Co. V. Foley Construction (1978), 54 Ohio St.2d 279.
Upon review of the record, we find that there was relevant, competent and credible evidence in the record supporting the trial court's finding that there was a mutual mistake of fact between the parties as to appellant's remedies upon appellee's default and that neither party contemplated the remedy of acceleration. Appellant testified during the bench trial as follows:
 Pursuant to this contract, what did you understand your remedy to be if Dr. Ross purchaser, failed to make payments to you at any time?
A. According to what the contract says?
Q. What was your understanding?
 A. My understanding before the contract was signed, he and I had talked about it that if he got to the point where he couldn't maintain the practice, that I would take the practice over in its entirety, including all equipment, all files, all typewriters, all tables.
In other words, everything. I'd just move in and take over and he'd just walk away and lose his $25,000 payment, whatever he paid me. But that isn't what the contract says.
 Q. What does the contract say as to what you could do if he stopped making payments?
 A. The contract says that if he stopped making payments, that all I can take back are the files.
 Q. All right. Did you understand yourself to have any other remedy if he stops making payments?
 A. Yes, I could either call the whole note due or take over the practice. I had two remedies.
 Q. It's been mentioned here in opening by Dr. Ross's counsel that you both understood your only remedy to be to come back in and take the practice back over; is that your understanding?
A. No.
Q. Was that ever your understanding?
 A. That was my understanding when he and I first talked. But we made the contract say that I had the remedy of calling the note due and either getting paid in full or take the practice back.
Transcript of Proceedings at 41-43.
Transcript of April 30, 1999, trial at 41- 43. However, during the trial, appellant also testified as follows:
 Q. Now Dr. Ross from the beginning expressed some doubt or some skepticism about his ability to pay you 3 or $4,000 a month, didn't he?
Yes.
 Q. And you indicated to him that in order to make this work, you would take the practice back if he couldn't make the payments?
A. That's correct.
 Q. And that was what one of the fundamental bases of your negotiations was?
A. That was one of them.
 Q. And throughout the negotiations, that was what you thought you would do if he failed to make the payments, that you'd take the practice back?
A. That was one of my options.
 Q. You indicated to Dr. Ross that that's what you would do if he couldn't make the payments was that you would take the practice back because you knew you could make money at it?
A. When he didn't offer — . . .
 A. I don't remember saying I could make money at it, but I said I would take the practice back over.
 Q. You didn't say to him that was one of your options; you indicated to him that's what you would do was take the practice back?
 A. That's what he and I orally agreed on, the entire practice, I agree.
 Q. And that's what you thought you were signing on September 27th in your office?
 A. I read the contract. That's what I thought [sic] was signing.
(Emphasis added). Transcript of April 30, 1999, trial at 91-93. Appellant also agreed that it was not until the fall of 1997 that he became aware that he had an additional remedy under the terms of the purchase agreement and could call all outstanding payments due and payable. Transcript of April 30, 1999, trial at 94.
Appellee also testified at the April 30, 1999, hearing regarding the parties' understanding of appellant's remedies in the event of appellee's default. Appellee, when asked "[w]hat was your understanding on the day you signed that [purchase] agreement in the event that you couldn't make the monthly payments over the next three or four years," responded as follows: "That Dr. Rinehart [appellant] would reclaim the practice and the right to compete along with the files and the patient mailing list and that." Transcript of April 30, 1999, trial at 199. Appellee also testified that he was "not cognizant" that appellant had any other remedies in the event of appellee's default. Transcript of April 30, 1999, trial at 199.
Based on the foregoing, we find that there was relevant, competent and credible evidence in the record supporting the trial court's finding that appellee had proved the existence of mutual mistake of fact as to appellant's remedies upon appellee's default. Specifically, there was competent and credible evidence that, at the time the purchase agreement was signed, the parties understood that appellant's sole remedy upon appellee's default was return of the practice and that neither party contemplated the remedy of acceleration by appellant. We find, therefore, that the trial court's decision was not against the manifest weight of the evidence.
Appellant' second assignment of error is, therefore, overruled.
 III
Appellant, in his third assignment of error, maintains that the trial court erred against the manifest weight of the evidence when: (1) it found that the parties agreed that, upon appellee's default, appellee need only return to appellant a list of client names[1] and addresses as well as the equipment that was transferred; and (2) it allowed appellee to maintain his practice for several months without making monthly payments to appellant.
As is stated above, appellant argues that the trial court's decision, ordering only the return of a list of client names and addresses as well as the furniture, fixtures, and equipment, was against the manifest weight of the evidence. Pursuant to the terms of the purchase agreement executed by the parties, appellee agreed to purchase from appellant "all of the furniture, furnishing, fixtures, equipment, leases, inventory, accounts receivables, records, files, client lists, work papers and tangible assets of or pertaining to Seller's practice (including , but not limited to all of the items of personal property listed on Exhibit A[2] attached hereto, the inventory of patient files, mailing list, telephone numbers and addresses as listed on Exhibit attached hereto and all outstanding accounts receivable at the time of the transfer."[3] The purchase agreement also states that the purchase price "shall include payment for Seller's covenant not to compete with Buyer . . .and for all the trade, goodwill and other intangible assets of Seller's practice."
Appellant argues that all of the above, including, but not limited to, accounts receivable, leases, and inventory, should have been returned to appellant upon appellee's default.[4]
However, the trial court, in its June 1, 1999, Judgment Entry, only ordered that appellant was entitled to a return of the patient list and to a return of "the furniture, fixtures, equipment and all other items included in Exhibit A attached to the Purchase Agreement." The trial court, in its entry, noted that appellant previously had retained a list of the client names and addresses.
We do not concur with appellant that the trial court's decision was against the manifest weight of the evidence. Assuming that the trial court, in determining appellant's remedy upon default, considered the language contained in the parties' purchase agreement minus the acceleration clause, appellant's sole remedy upon appellee's default would have been the return of the patient files. In addition to the language set forth above, the parties' purchase agreement provides that in the event of appellee's default, appellant "may possess all patient files for the purpose of resale and recovering and [sic] outstanding balance." No provision is made in the purchase agreement for the return of anything more upon appellee's default. Moreover, appellant admitted the same in testifying as follows at trial: "[t]he contract says that if he [appellee] stopped making payments, that all I can take back are the files." Transcript of April 30, 1999, trial at 42. At the trial in this matter, appellee also testified as follows:
 Q. So when your attorney says that you and Dr. Rinehart both understood that you would return the practice to Dr. Rinehart, you're saying that did not include any physical items?
A. Yes.
Q. Yes, you agree with that statement?
 A. I agree it did not automatically entitle the return of the assets.
 Q. Okay. So under your version of the contract then, you could have bought this building from Dr. Rinehart, caused every patient to go away and only needed to hand back to Dr. Rinehart the files?
A. Which was the practice.
Q. And which was in the contract?
A. Right.
 Q. Okay. So there's no misunderstanding on your part that this contract said he only got the files back?
A. Yes.
Q. Okay. I think — —
 A. And the right to use those files to compete anywhere he wanted.
 Q. Okay. Well, I think your attorney has stated all along that in this case that you understood this contract to mean you only had to give the practice to Mr. Rinehart back should there not be enough money?
 A. As well as the right to use them, to develop the practice again.
 Q. But your testimony today now that you understood just to mean you have to return the files to Mr. Rinehart?
A. The practice and the right to compete.
 Q. He would have to purchase the right to compete from you?
 A. No, that would be automatically returned as part of the practice.
Transcript of April 30, 1999, trial at 127-128
There was, therefore, competent and credible evidence in the record that appellant was only entitled to a return of the patient files upon appellee's default and not to a return of any intangible or tangible assets.[5]
We further find that, even if the trial court only considered appellant's testimony at the April 30, 1999, bench trial, the trial court's decision awarding appellant only the patient list, furniture, fixtures and equipment was not against the manifest weight of the evidence. At the bench trial, appellant testified as follows:
 Q. Pursuant to this contract, what did you understand your remedy to be if Dr. Ross purchaser, failed to make payments to you at any time?
A. According to what the contract says?
Q. What was your understanding?
 A. My understanding before the contract was signed, he and I had talked about it that if he got to the point where he couldn't maintain the practice, that I would take the practice over in its entirety, including all equipment, all files, all typewriters, all tables.
In other words, everything. I'd just move in and take over and he'd just walk away and lose his $25,000 payment, whatever he paid me. But that isn't what the contract says. (Emphasis added.)
Transcript of Proceedings at 41 — 42.
The trial court, in its June 1, 1999, Judgment Entry, ordered the return of the above to appellant. Thus, appellant, during his own testimony, did not define the "practice" as including inventory, accounts receivable, work papers, records, or any other tangible or intangible assets other than equipment and all files.
Appellant, in his third assignment of error, also maintains that the trial court "erred against the manifest weight of the evidence when it allowed the defendant-appellee to maintain his practice for several months without making monthly payments and without returning the practice to the plaintiff-appellant." The record in the case sub judice clearly establishes that, commencing in October of 1997, appellee stopped making payments to appellant due to financial difficulties. Appellee testified at trial that during October of 1997, appellant "said I'll just come in and take over [the practice] by Thanksgiving and you can be on your way." Transcript of April 30, 1999, trial at 206. Appellee agreed that, at such time, he offered appellant only the patient files. Pursuant to a letter to appellant dated October 28, 1997, appellee further advised appellant that "All else is open to negotiation." When appellant subsequently attempted to accelerate the payments due under the purchase agreement, appellee refused to pay.
We concur with appellant that, by both stopping the monthly payments to appellant and, at the same time, failing to return the chiropractic practice to appellant, appellee "continued to reap the benefits of the Purchase Agreement without fulfilling his obligation under any of the responsibilities of that agreement." On such basis, we find that appellant is entitled to recovery inquantum meruit. Quantum meruit is generally awarded when one party confers some benefit upon another without receiving just compensation for the reasonable value of the benefit conferred.Aultman Hosp. Assn. v. Comm. Mut. Ins. Co. (1989), 46 Ohio St.3d 51,55. Clearly, appellee received such a benefit by both ceasing to make the monthly payments and also failing to return the chiropractic practice to appellant. We further find, therefore, that the trial court erred in finding that appellee was not responsible for the monthly payments to appellant from October of 1997, when appellee ceased making payments to appellant, up until the trial court's June 1, 1999, Judgment Entry[6] ordering the return of the practice to appellant.
Accordingly, appellant's third assignment of error is sustained in part and overruled in part.
The judgment of the Ashland County Court of Common Pleas is affirmed in part and reversed in part. This matter is reversed and remanded to the trial court regarding the issue of monthly payments. The trial court is specifically directed to calculate the monthly payments due to appellant from appellee for the period from October, 1997, until the trial court's June 1, 1999, Judgment Entry and to enter judgment in favor of appellant and against appellee in such amount.
 JUDGMENT ENTRY
For the reasons stated in the Memorandum-Opinion on file, the Judgment of the Ashland County Court of Common Pleas is affirmed in part and reversed in part and remanded back to the trial court for proceedings consistent with this opinion. Costs to appellee.
By Edwards, J.
Gwin, P.J. and Milligan, V.J. concurs
[1] At the trial in this matter, appellant testified that the client files were of no value to him because "[y]ou can't legally sell files. You have to sell the practice. . .I wouldn't buy a set of files. That's worthless. It's like buying a mailing list from magazines." Transcript of Proceedings at 59.
[2] Exhibit A is a list of furniture and supplies relating to the chiropractic practice.
[3] Ending parenthesis is missing in original contract.
[4] Appellant, in his brief, specifically argues that the trial court should have ordered "the furniture, furnishings, fixtures, equipment, leases, inventory, accounts receivable, records, files, client lists, work papers, tangible assets, all good will, and other intangibles assets" returned to appellant.
[5] Appellant, as part of the parties' agreement in this matter, did not sell a building to appellee but rather sold the location of appellant's practice. However, appellee, after purchasing appellant's practice, bought a building by land contract and moved the practice. Since the building, therefore, was not a part of the practice, appellant was not entitled to a return of the same upon appellee's default. At trial, appellant testified that he did not believe that, upon appellee's default, he would be entitled to own appellee's building and, in fact, "didn't even necessarily want to stay there." Transcript of Proceedings at 95. However, appellant also testified that he could have "continued the payments on the land contract had he [appellee] walked out." Id.
[6] This court is cognizant that of the total purchase price for the chiropractic practice, $75,400.00 was paid to appellant for his noncompetition agreement. Thus, part of appellee's monthly payments to appellant went towards the payment of the $75,400.00. At the trial in this matter, appellant admitted that he began competing with appellant approximately 90 days after his October 21, 1997, letter to appellant calling the note due and payable. Transcript of Proceedings at 62. Therefore, from approximately February of 1998 on, appellant competed with appellee. The trial court, in calculating the amount due to appellant from appellee for the period from October, 1997, through June 1, 1999, should deduct an appropriate amount.