WALKER et al., Appellants,

v.

DOMINION HOMES, INC., et al., Appellees.

[Cite as *Walker v. Dominion Homes, Inc.*, 164 Ohio App.3d 385, 2005-Ohio-6055.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 04AP–1388.

Decided Nov. 15, 2005.

388

Fusco, Mackey, Mathews, Smith & Watkins, and Michael J. Fusco, for appellants.

Porter, Wright, Morris & Arthur, Joseph W. Ryan Jr., Monique B. Lampke, and Lawrence B. Hughes, for appellees.

KLATT, Judge.

{¶ 1} Plaintiffs-appellants, Frank and Lisa Walker, appeal from a judgment of the Franklin County Court of Common Pleas granting summary judgment to defendants-appellees, Dominion Homes, Inc. ("Dominion") and Dominion Home

Financial Services, Inc. ("DHFS"). For the following reasons, we affirm in part, reverse in part, and remand.

{¶ 2} During the summer of 2000, the Walkers were searching for a site on which to build a new house, a builder to construct the house, and financing to purchase the site and pay for the construction. In the midst of this search, the Walkers were attracted to advertisements for Dominion that publicized the "2–1 buydown" loan program, whereby a qualified individual could receive a 30–year mortgage loan from a conventional lender at low interest rates. Under this program, the interest rate for the first year's payments would be 5.125 percent, the rate for the second year's payments 6.125 percent, and the rate for the third through 13th years' payments 7.125 percent.

{¶ 3} In August 2000, the Walkers met with Denise Buede, a salesperson for Dominion, to discuss building a home in the Highland Lakes subdivision in Westerville, Ohio. The Walkers told Buede that they were interested in the 2–1 buydown program. After discussing the details of the program with the Walkers, Buede stated that she believed the Walkers would qualify for conventional financing under the program and that she would "look in on" the 5.125 percent starting interest rate.

{¶ 4} On August 13, 2000, Lisa Walker completed the "Mortgage Application Summary/Pre–Qualification Worksheet," the initial step required to apply for financing through DHFS. In this document, Lisa Walker disclosed her yearly income and authorized DHFS to obtain her credit reports.

{¶ 5} The next day, Deena Crawford, then a loan counselor with DHFS, received and reviewed a MCS credit services credit report for the Walkers. The credit report disclosed that both Walkers had low credit scores due to high credit balances, delinquency on their credit accounts, the referral of some of their credit accounts to collections, and other credit problems.

{¶ 6} Based upon her review of the credit report, Crawford drafted a confidential opinion letter in which she provided an opinion as to the Walkers' ability to qualify for a mortgage loan. Crawford indicated that the Walkers fell into the "possibly approved" category of home buyers, meaning that "[i]ssues with credit, income, or assets need[ed] [to be] resolved for [final loan] approval." Further, Crawford wrote "FHA" next to "suggested programs" and stated that the Walkers could not "go conforming conventional" because their "scores [were] too low." In an affidavit, Crawford explained that by these comments, she meant that "the Walkers might be able to be approved under FHA or a non-conforming loan program but not under the [2–1 buy-down] program."

{¶ 7} Crawford faxed the confidential opinion letter to Buede on August 14, 2000. Neither Buede nor Crawford disclosed to the Walkers the information contained in the confidential opinion letter.

{¶ 8} On August 20, 2000, the Walkers met with Buede to sign the home purchase agreement. In that agreement, Dominion agreed to pay the loan-commitment fee charged by the lender if a certain section of the agreement, which was originally left blank, was completed. In the Walkers' home-purchase agreement, the relevant section was completed with the information that DHFS was the proposed first-mortgage lender and the 2–1 buydown program was the proposed loan program.

{¶ 9} The home-purchase agreement required Dominion to give written consent before the lender could lock in an interest rate. Thus, on the same day that the Walkers signed the home-purchase agreement, they also signed a document entitled "Seller's Consent to Lock Rate," in which they requested, and Dominion consented to, a 90–day rate lock for a conventional loan under the 2–1 buydown program at the 5.125 percent, 6.125 percent, and 7.125 percent interest rates. The Walkers also completed a loan-registration form, which DHFS required before it would guarantee an interest rate. Like the seller's-consent-to-lock-rate form, the loan-registration form referred to the 2–1 buydown program.

{¶ 10} The Walkers maintain that they believed that they would qualify for the 2–1 buydown program based upon their discussion with Buede regarding the program, the seller's consent-to-lock-rate form, and the loan-registration form. If the Walkers had known they would not likely qualify for the 2–1 buy-down program, they would have refused to contract with Dominion. Moreover, Lisa Walker testified in her affidavit that the 2–1 buy-down program was the primary influence on the Walkers' decision to select Dominion instead of another builder.

{¶ 11} After the Walkers signed the home-purchase agreement, they met with Crawford to begin the processing of their application for the 2–1 buydown program. Lisa Walker testified in her affidavit that she questioned Crawford regarding whether the Walkers would have difficulty qualifying for the 2–1 buy-down program. Crawford responded that approval turned upon whether DHFS would be able to verify the Walkers' income and whether the Walkers were to pay certain tax liens and provide an explanation regarding a delinquent payment on one of their credit accounts. The Walkers then paid the tax liens and provided the explanation.

{¶ 12} According to Lisa Walker, DHFS did not inform the Walkers that they did not qualify for the 2–1 buydown program until October 10, 2000—about ten days before the scheduled closing. Upon discovering that they did not qualify, the Walkers asked various Dominion representatives whether Dominion would release them from the home-purchase agreement. Dominion refused and threat-

ened the Walkers with the loss of their deposit ($2,700) if they did not close within a short time.

{¶ 13} DHFS did offer the Walkers another loan, but at a higher rate and contingent upon the Walkers' making a 20 percent down payment. The Walkers declined this offer, and instead obtained from another lender a 30–year fixed mortgage loan with an interest rate of 8.375 percent.

{¶ 14} On September 10, 2002, the Walkers filed suit against Dominion and DHFS, alleging violations of the Ohio Consumer Sales Practices Act ("CSPA"), breach of contract, and promissory estoppel. The Walkers alleged that defendants deceived them regarding financing, provided them with a defective home, and failed to reimburse them for damages incurred because of the defects.

{¶ 15} On June 19, 2003, defendants filed a motion for partial summary judgment in which they sought judgment in their favor with respect to the CSPA, breach-of-contract, and promissory-estoppel claims pertaining to the financing of the Walkers' home. On February 3, 2004, the trial court granted defendants' motion so that the only claims that remained to be resolved at trial were the CSPA, breach-of-contract, and promissory-estoppel claims pertaining to defects in the Walkers' home, and property damage. The Walkers voluntarily dismissed these remaining claims, however, thus converting the trial court's February 3, 2004 decision into a final appealable order. The Walkers now appeal from that order.

{¶ 16} On appeal, the Walkers assign the following errors: [1]

1. The trial court erred in concluding that defendants did not violate the Ohio Consumer Sales Practices Act ("CSPA").

2. The trial court erred in concluding, as a matter of law, that no implied duty of good faith existed on the part of defendants.

{¶ 17} Appellate review of summary judgment motions is de novo. *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Banc Corp.* (1997), 122 Ohio App.3d 100, 103, 701 N.E.2d 383. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made.

---

1. Notably, in this appeal, the Walkers do not challenge, and we do not review, the judgment in defendants' favor on the promissory-estoppel claim.

*State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343.

{¶ 18} When seeking summary judgment on the ground that the nonmoving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the nonmoving party's claims. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. The moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the nonmoving party has no evidence to prove its case. Id.; *Vahila v. Hall* (1997), 77 Ohio St.3d 421, 429, 674 N.E.2d 1164. Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the nonmoving party has no evidence to support the nonmoving party's claims. *Dresher*, supra, at 293, 662 N.E.2d 264. If the moving party meets this initial burden, then the nonmoving party has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. Id.

{¶ 19} By their first assignment of error, the Walkers argue that the trial court erred in granting summary judgment to defendants on the Walkers' claim that defendants violated the CSPA. The Walkers maintain that they produced sufficient evidence to create questions of fact regarding whether defendants committed unfair, deceptive, and/or unconscionable acts in connection with the sale of the Walkers' new home.

{¶ 20} The CSPA prohibits "unfair or deceptive" and "unconscionable" acts or practices by suppliers in consumer transactions. *Einhorn v. Ford Motor Co.* (1990), 48 Ohio St.3d 27, 29, 548 N.E.2d 933. Designed to compensate for traditional consumer remedies, the CSPA gives protection to consumers from "unscrupulous suppliers" in a more expedient and affordable manner than a tort or contract action under the common law. Id.; *Roelle v. Orkin Exterminating Co., Inc.* (Nov. 7, 2000), Franklin App. No. 00AP–14, 2000 WL 1664865. Given its remedial purposes to protect the consumer and promote fairness, the CSPA must be liberally construed in favor of consumers. *Einhorn* at 29, 548 N.E.2d 933; *Lee v. C.D.E. Home Inspection Co., Inc.*, Franklin App. No. 00AP–516, 2002-Ohio-4316, 2002 WL 1938248, at ¶ 33.

{¶ 21} Pursuant to R.C. 1345.02(A), "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." Although R.C. 1345.02(B) lists

specific deceptive acts and practices, that list does not limit the broad prohibition contained in R.C. 1345.02(A). Indeed, the list in R.C. 1345.02(B) is augmented by rules adopted by the Ohio Attorney General. R.C. 1345.05(B)(2).

■ {¶ 22} In the case at bar, the Walkers argue that defendants' actions were unfair or deceptive in four different ways. First, the Walkers argue that defendants' actions were deceptive pursuant to R.C. 1345.02(B)(1) and (5), which state:

[T]he act or practice of a supplier in representing any of the following is deceptive:

(1) That the subject of a consumer transaction has * * * benefits that it does not have;

* * *

(5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not[.] * * *

We disagree. Defendants never guaranteed to the Walkers that they would qualify for the 2–1 buydown program. Many of the documents the Walkers signed, including the "Mortgage Application Summary/Pre–Qualification Worksheet," explicitly stated that DHFS had not approved the financing the Walkers sought. Accordingly, defendants never represented or promised that the 2–1 buydown program was a benefit included within the home-purchase agreement. Likewise, there was no "previous representation" made before the home was "supplied" at the closing that the Walkers would receive a loan under the 2–1 buydown terms. Therefore, defendants' actions did not constitute the type of deception described in R.C. 1345.02(B)(1) or (B)(5).

■ {¶ 23} Second, the Walkers argue that defendants' actions were deceptive pursuant to Ohio Adm.Code 109:4–3–10(A), which states:

It shall be a deceptive act or practice in connection with a consumer transaction for a supplier to:

(A) Make any representations, claims, or assertions of fact, whether orally or in writing, which would cause a reasonable consumer to believe such statements are true, unless, at the time such representations, claims, or assertions are made, the supplier possess or relies upon a reasonable basis in fact such as factual, objective, quantifiable, clinical or scientific data or other competent and reliable evidence which substantiates such representations, claims, or assertions of fact[.]

Again, we disagree. Defendants allegedly made only one representation, claim, or assertion of fact: that the 2–1 buydown program was available to qualified individuals. Not only was this representation true at the time it was made, but it continued to be true throughout the Walkers' dealings with defendants. There-

fore, defendants' actions did not constitute the type of deception described in Ohio Adm.Code 109:4–3–10(A).

{¶ 24} Third, the Walkers argue that defendants' actions were deceptive pursuant to Ohio Adm.Code 109:4–3–03(B)(1), which states:

It shall be a deceptive and unfair act or practice for a supplier to make an offer of sale of any goods or services when such offer is not a bona fide effort to sell such goods or services. An offer is not bona fide if:

(1) A supplier uses a statement * * * or makes a representation in any advertisement which would create in the mind of reasonable consumer, a false impression as to * * * [a] material aspect of the offered goods or services in such a manner that, upon subsequent disclosure or discovery of the facts, the consumer may be induced to purchase goods or services other than those offered[.]

Again, we disagree. The advertisement of the 2–1 buydown program did not constitute an offer. Rather, the advertisement merely informed potential purchasers of available loan terms and invited them to apply for the program. See *Ehrlich v. Willis Music Co.* (1952), 93 Ohio App. 246, 247, 51 O.O. 8, 113 N.E.2d 252. After application and approval, DHFS offered loans under the terms of the 2–1 buydown program to qualified purchasers—a group that did not include the Walkers. As no offer was ever made to the Walkers, defendants' actions did not constitute the type of deception described in Ohio Adm.Code 109:4–3–03(B)(1).

{¶ 25} Finally, the Walkers argue that defendants' actions were unfair or deceptive pursuant to the broad prohibition against unfair or deceptive acts and practices contained in R.C. 1345.02. Generally, an act or practice is deceptive if it " 'has the likelihood of inducing in the mind of the consumer a belief which is not in accord with the facts.' " *Lee,* supra, 2002-Ohio-4316, 2002 WL 1938248, at ¶ 30, quoting *Funk v. Montgomery AMC/Jeep Renault* (1990), 66 Ohio App.3d 815, 823, 586 N.E.2d 1113. An act or practice is unfair if it is marked by injustice, partiality, or deception, or it results in inequitable business dealings. *Saraf v. Maronda Homes, Inc.,* Franklin App. No. 02AP–461, 2002-Ohio-6741, 2002 WL 31750249, at ¶ 58. In determining whether an act or practice is either unfair or deceptive, a court must focus upon how the consumer views the act or practice, and not whether the supplier intended to be unfair or deceptive. *Lee,* at ¶ 30; *Smaldino v. Larsick* (1993), 90 Ohio App.3d 691, 697, 630 N.E.2d 408; *Frey v. Vin Devers, Inc.* (1992), 80 Ohio App.3d 1, 6, 608 N.E.2d 796; *Funk,* supra, at 823, 586 N.E.2d 1113.

{¶ 26} Here, construing the facts in the Walkers' favor, we find that a reasonable person could conclude that defendants unfairly led the Walkers to believe that they might qualify for the 2–1 buydown program, when, in fact, they could not qualify. Dominion's first representation regarding the 2–1 buydown

program—that the Walkers "probably" would qualify—was arguably truthful when Buede made it. However, only days after Buede made that representation, Crawford drafted the confidential opinion letter, which the Walkers interpret as DHFS's refusal to approve them for any conventional loan, including a loan under the 2–1 buydown program, because their credit scores were too low. The Walkers' interpretation of the confidential opinion letter is supported by the letter itself, which states without qualification that the Walkers could not "go conforming conventional." Additionally, the Walkers' interpretation is supported by Crawford's explanation that the letter meant that "the Walkers would not be able to be qualified under DHFS's conforming, conventional loan programs" and that "the Walkers might be able to be approved under FHA or a non-conforming loan program but not under the [2–1 buy-down] program."

{¶ 27} If on August 14, 2000, HFS foreclosed the possibility that the Walkers might qualify for the 2–1 buydown program, then defendants misled the Walkers with their subsequent actions. First, Buede misled the Walkers when she gave them the seller's-consent-to-lock-rate form and loan-registration form to sign on August 20, 2000, the same day the Walkers executed the home-purchase agreement. Both forms related to the "2–1 buydown" program, and by asking the Walkers to sign them, Dominion tacitly represented to the Walkers that they might qualify for the program, even though DHFS had already determined that they could not. Second, Crawford misled the Walkers when she told them during the application process that the only impediments to the Walkers' receiving a loan under the 2–1 buydown program was the verification of their income, the payment of tax liens, and an explanation of a delinquent credit account.

{¶ 28} Defendants, however, argue that they did not mislead the Walkers because DHFS did not definitively deny the Walkers' application for the 2–1 buydown program until late October 2000. Defendants assert that the confidential opinion letter merely reflected DHFS' preliminary review of the Walkers' creditworthiness, and it was not a final determination that the Walkers could not qualify for the 2–1 buydown program. Because it only stated DHFS's initial opinion, defendants interpret the letter to leave open the possibility that the Walkers could qualify if they provided an explanation of certain credit lapses and information showing that they had sufficient income and assets.

{¶ 29} Thus, whether or not defendants committed unfair or deceptive acts turns upon the meaning of the confidential opinion letter. If the letter communicated that the Walkers could not qualify for the 2–1 buydown program, then defendants' subsequent actions could be viewed as unfair or deceptive. If, however, the letter only communicated that it was unlikely that the Walkers could qualify for the 2–1 buydown program, then defendants were merely encouraging the Walkers to apply for the most advantageous financing they could

possibly obtain. Given the parties' differing interpretations of the confidential opinion letter, we conclude that there is a genuine issue of material fact regarding whether defendants' actions were unfair or deceptive under R.C. 1345.02.

{¶ 30} In addition to asserting that defendants' actions were unfair or deceptive, the Walkers also assert that defendants' actions were unconscionable. Pursuant to R.C. 1345.03(A), "[n]o supplier shall commit an unconscionable act or practice in connection with a consumer transaction." In determining whether an act is unconscionable, a court must consider a variety of circumstances, including "[w]hether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction." R.C. 1345.03(B)(3).

{¶ 31} Here, based upon the evidence described above, a reasonable person could find that defendants knew at the time the parties executed the home-purchase agreement that the Walkers would be unable to receive financing under the 2–1 buydown program. Because the evidence establishes that the program was the primary reason the Walkers chose to contract with Dominion and the Walkers would not have contracted with Dominion had they known they would not qualify for the program, a reasonable person could find that the 2–1 buydown program was a substantial benefit to the Walkers in the purchase of their home. Therefore, genuine issues of material fact exist that also prevent summary judgment on the Walkers' claim that defendants violated R.C. 1345.03.

{¶ 32} Finally, we note that defendants argue that they did not violate any provision of the CSPA because they did not have a "duty to disclose" any information regarding financing to the Walkers. We find this argument unavailing. The duty at issue here is the duty to refrain from unfair, deceptive, or unconscionable acts. R.C. 1345.02 and 1345.03. The trier of fact can certainly consider the failure to disclose information in determining whether the defendant committed an unfair, deceptive, or unconscionable act. The Walkers were not required to establish that defendants owed them an independent "duty to disclose." Moreover, in the case at bar, the Walkers' CSPA claims are based, at least in part, on what defendants represented to them regarding their ability to obtain 2–1 buydown program financing for the purchase of their home.

{¶ 33} Because we conclude that the trial court erred in granting summary judgment in defendants' favor on the Walkers' CSPA claim, we sustain the Walkers' first assignment of error.

{¶ 34} By their second assignment of error, the Walkers argue that the trial court erred in granting summary judgment to defendants on the breach-of-contract claim. The Walkers assert that the home-purchase agreement contained an implied duty of good faith that defendants breached when they did not inform

the Walkers that they would not receive financing through the 2–1 buydown program before they entered into the agreement.

{¶ 35} Even if we were to impose an implied-in-law duty of good faith in these circumstances, the Walkers present no evidence that defendants breached this duty. A duty of good faith originates from a contractual relationship. See *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 444, 662 N.E.2d 1074. Thus, logically, such a duty cannot exist until the underlying contract is formed. Here, the Walkers claim that defendants "breached" the duty of good faith during the formation of the home-purchase agreement, *before* any contract, or corresponding duty of good faith, existed. Because defendants cannot breach a not-yet existing duty, the trial court properly granted defendants summary judgment on the Walkers' breach-of-contract claim.

{¶ 36} Accordingly, we overrule the Walkers' second assignment of error.

{¶ 37} For the foregoing reasons, we sustain the Walkers' first assignment of error and overrule their second assignment of error. With respect to the trial court's grant of summary judgment on the breach-of-contract claim, we affirm the February 3, 2004 judgment. However, with respect to the trial court's grant of summary judgment on the CSPA claim, we reverse the February 3, 2004 judgment and remand this case to the trial court for further proceedings in accordance with law and this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

BROWN, P.J., and BRYANT, J., concur.