OPINION
{¶ 1} Appellants JRM Limited and Richard K. Brown appeal the August 1, 2006, decision of the Stark County Common Pleas Court entering judgment in favor of Appellee 2002, LTD in the amount of $133,481.84.
 STATEMENT OF THE FACTS AND CASE {¶ 2} The relevant facts in this case are as follows:
 {¶ 3} In November, 2001 Appellant JRM Limited ("JRM") entered into an inventory funding arrangement with Barbco, Inc. ("Barbco"). Barbco manufactures and sells commercial horizontal earth boring machines. Barbco also manufactures, rents and sells the boring augers for these machines. The horizontal boring machine manufacturing industry historically is a no inventory, made to order industry with significant lag time between order and delivery. The machines are fairly standard but the cost to manufacture augers and boring machines for inventory is high. By entering into an inventory funding agreement Barbco would be able to immediately fill orders for boring machines and augers. By filling orders from inventory Barbco theoretically had an advantage over competitors.
 {¶ 4} The principle behind this inventory funding arrangement was for Appellant JRM to purchase augers from Barbco for 70% of the retail price. The augers were inventoried at Barbco. Barbco then sold the augers directly from inventory to their customers. Upon sale of augers to its customers, Barbco then purchased the augers back from JRM at 70% of the retail price, plus a commission. Under this set-up, Barbco was able to ship directly from inventory and JRM would receive a commission on Barbco's sales. *Page 3 
 {¶ 5} The initial inventory funding arrangement between JRM and Barbco was funded by JRM's managing partner, Richard Brown. Mr. Brown funded $150,000.00 in auger inventory.
 {¶ 6} On December 27, 2001, JRM entered into two contracts with Barbco to fund two separate inventory programs. One program funded the manufacture and inventory of augers and one funded the manufacture and inventory of boring machines. The inventory price on the augers ranged from $150.00 to $12,500.00 each. The inventory price on boring machines ranged from $5,000.00 to $100,000 plus for each machine. Barbco paid JRM a 4.5% commission on all boring machines sold from inventory, 5.5% on all augers sold from inventory and 2.75% for auger rental. The two contracts called for purchase of the initial inventory in the first year (ramp up), ongoing financing of replacement inventory for years two and three and finally liquidation in year four (ramp down).
 {¶ 7} JRM was unable to fund the two programs which precipitated the need for Richard Brown to seek other sources of funding.
 {¶ 8} On January 24, 2002, JRM entered into a funding agreement with 2002, Ltd. At that time, the parties also entered into a security agreement granting 2002, Ltd. a security interest in the inventory.
 {¶ 9} Dr. David W. Smith was the sole member of 2002, Ltd. and Connie Schering was its agent. Dr. Smith, through 2002, Ltd., funded the two JRM/Barbco programs and was to share 50% of the commissions generated by the sale of the inventory. *Page 4 
 {¶ 10} Richard Brown, through JRM, administered the programs and received the other 50% of the commissions. The intent of the inventory programs was to increase Barbco sales resulting in increased commissions for JRM. JRM and 2002, Ltd. were to gain profits from the programs based on the funding and administration of the program.
 {¶ 11} Richard Brown removed his initial funding from the program early in 2002 and thereafter, provided no additional funding for the programs. The programs were funded solely by 2002, Ltd. Maximum funding reached $590,268.84 on August 1, 2003.
 {¶ 12} On June 30, 2003, after discussions with Mr. Brown and after an accountant reviewed the inventory programs, Dr. Smith wrote Mr. Brown recapping his concerns about the inventory programs, including the return on investment. Said letter further stated that 2002, Ltd.'s accountant recommended that 2002, Ltd. not extend its financial commitment.
 {¶ 13} Soon thereafter, Mr. Brown began negotiations with Barbco to increase the commission rates and extend inventory funding by an additional $300,000.00.
 {¶ 14} On August 18, 2003, Mr. Brown presented new inventory funding program proposals to Barbco. Mr. Brown informed Barbco that Barbco would be required to accept the new program funding offers or the existing programs would cease. Barbco refused the offers and considered the existing inventory funding programs at an end.
 {¶ 15} On August 31, 2003, Dr. Smith wrote Mr. Brown stating 2002, Ltd.'s intent to terminate its agreement with JRM. Dr. Smith also stated that he would not approve of any further funding.
 {¶ 16} Funding of the inventory programs continued until September 5, 2003. Funding continued well past the time the Barbco contracts were considered terminated *Page 5 
and after Appellant JRM was notified to cease funding the programs out of the 2002, Ltd. capital.
 {¶ 17} The end result of the JRM/2002, Ltd. contractual relationship for 2002, Ltd. was in debt for capital funds in excess of $140,000, and JRM owed 2002, Ltd. $133,481.003 for capital funding.
 {¶ 18} On March 23, 2004, Barbco issued a check to JRM in the amount of $116,480.00 for the sale of boring machine B-54. The check was deposited in JRM's account on March 24, 2004.
 {¶ 19} On March 25, 2004, Mr. Brown notified Dr. Smith that the check for $116,480.00 would be arriving from Barbco by the middle of the following week. In fact Mr. Brown had deposited the check the day before. In the same letter, Mr. Brown proposed that JRM pay Dr. Smith $14,240.00 and retain $100,000.00 for the start up of a new metal brokering venture.
 {¶ 20} On March 27, 2004, Dr. Smith turned down the new venture and requested that Mr. Brown apply the full amount to the 2002, Ltd. account.
 {¶ 21} On April 16, 2004, Mr. Brown deposited $50,000.00 from the sale of boring machine B-54 in the 2002, Ltd. account.
 {¶ 22} After the April 16, 2004, payment and until all funded inventory was sold, JRM received checks from Barbco totaling $89,470.00 for return of 2002, Ltd. capital and $4,763.15 in fees to be shared between 2002, Ltd. and JRM pursuant to their agreement.
 {¶ 23} JRM paid 2002, Ltd. $78,560.00 during this same period. *Page 6 
 {¶ 24} Appellee 2002, Ltd., filed its complaint in this case on November 4, 2005, in the Stark County Court of Common Pleas against Appellants, JRM Limited and Richard K. Brown ("JRM" and "Brown"). Appellants timely answered the complaint and, in addition, Appellant JRM filed its counterclaim on December 7, 2005. Both the complaint and counterclaim involved a written contract entered into between the Appellee 2002, Ltd. and Appellant JRM.
 {¶ 25} On March 31, 2006, an Amended Complaint was filed by Appellee 2002, Ltd.
 {¶ 26} In response, additional pleadings were then filed by Appellants on April 14, 2006, including a restatement of the JRM counterclaim.
 {¶ 27} By agreement of the parties, the parties' respective claims were tried before the trial court's magistrate beginning June 13, 2006.
 {¶ 28} On June 16, 2006, the magistrate issued his decision, with findings of fact and conclusions of law.
 {¶ 29} In said opinion, the magistrate found inter alia, that during the course of the funding program, commissions, rental fees, and capital funding were returned to 2002, Ltd.'s account but that JRM would subsequently draw out funding for new inventory thereby drawing out funding capital as well as 2002, Ltd.'s commissions and fees. The magistrate found that 2002, Ltd.'s income from the programs was being used to fund additional inventory for Barbco, which in turn generated sales for Barbco and commissions and fees for JRM. In essence, the magistrate found that JRM was utilizing 2002, Ltd.'s income to increase its profits. 2002, Ltd. did not receive what it had bargained for. *Page 7 
 {¶ 30} The magistrate further found that from April 16, 2003 until present, JRM had retained $77,531.57 of 2002, Ltd. money, $64,240.00 remainder of the B-54 machine sale, plus $10,910.00 return of capital funding, plus $2,381.57 in fees.
 {¶ 31} The magistrate also found that Richard Brown personally channeled JRM funds, which he knew belonged to 2002, Ltd., to pay for his individual debts. He found that Mr. Brown continuously, through August 2005, assured Dr. Smith that 2002, Ltd. would be paid off in a few months and that his last inventory from the funding project was sold in June of 2005.
 {¶ 32} Pursuant to Civ.R. 53(E), Appellants timely filed their objections to the magistrate's report on June 30, 2006. Appellee filed its brief in opposition on July 21, 2006, and a partial transcript of proceedings was filed on July 24, 2006.
 {¶ 33} On August 1, 2006, the trial court overruled the appellants' objections, affirmed the Report of the Magistrate and granted final judgment in favor of the appellee on its claims for breach of contract and conversion. The final judgment rendered in this action also rejected the JRM counterclaim for breach of contract.
 {¶ 34} Appellants timely filed their notice of appeal on August 25, 2006, and assign the following errors for review:
 ASSIGNMENTS OF ERROR {¶ 35} "I. THE TRIAL COURT'S JUDGMENT IN FAVOR OF THE APPELLEE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND, FURTHER, ERRONEOUS AS A MATTER OF LAW, TO APPELLANTS' PREJUDICE.
 {¶ 36} "II. THE TRIAL COURT ERRED IN ENTERING JUDGMENT AGAINST THE APPELLANT RICHARD K. BROWN, THEREBY FAILING TO RECOGNIZE THAT *Page 8 
PURSUANT TO RIGHTS OF RECOUPMENT AND SETOFF, MONIES WERE LAWFULLY RETAINED BY APPELLANT JRM, LIMITED, FOLLOWING THE APPELLEE'S BREACH OF CONTRACT, TO APPELLANTS' PREJUDICE."
 I. {¶ 37} In their first assignment of error, Appellants argue that the trial court judgment was against the manifest weight of the evidence. We disagree.
 {¶ 38} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52, citing State v. Martin (1983), 20 Ohio App.3d 172,175.
 {¶ 39} Appellant JRM argues that Appellee 2002, Ltd. unilaterally breached their contract by refusing to provide any further funding approximately 18 months into the contract, which Appellants claim had a duration of four (4) years.
 {¶ 40} Appellee argues that the contract does not contain a term of duration and further that it did continue to provide funding up to and after such time as JRM terminated its program contract with Barbco. Appellee argues that the termination of the JRM-2002, Ltd. contract was mutual, not unilateral.
 {¶ 41} While there was some conflicting evidence presented to the trial court, the trial court, as the trier of fact was in a better position to observe the witnesses' *Page 9 
demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact.State v. DeHass (1967), 10 Ohio St.2d 230, syllabus 1.
 {¶ 42} It is undisputed that the actual contract between 2002, Ltd. and JRM Limited does not contain an express term of duration, and while it is also undisputed that the durational term for the JRM-Barbco contract was four (4) years, the 2002, Ltd.-JRM contract contained an integration clause stating that such "Agreement constitutes the entire Agreement between the Parties. There are no other promises or conditions in any other agreement, oral, or written." " `When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, or antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting and writing.' " Ed Schory Sons vs. Society Natl.Bank (1996), 75 Ohio St.3d 433, 440, 662 N.E.2d 1074, quoting 3Corbin, Corbin on Contracts (1960) 357, Section 573. We therefore cannot impute the four (4) year term into the 2002, Ltd.-JRM contract.
 {¶ 43} Furthermore, upon review of the June 30, 2003, letter from David Smith to Richard Brown, we find that in addition to expressing his financial concerns, Dr. Smith stated only that upon discussing the possibility of extending the program in excess of his initial $600,000.00 commitment with his accountant, it was recommended to him that he not extend his financial commitment any further at that time and that he begin to pay off his note at a greater rate. He did not state any intention to terminate the agreement. To the contrary, at the end of the letter, Dr. Smith states "As always, I enjoy working *Page 10 
with you. I will keep you in touch as these matters progress and look forward to our continuing communication among Barbco, 2002, and JRM."
 {¶ 44} Dr. Smith did, however, terminate 2002, Ltd.'s relationship with JRM in the August 31, 2003, letter. However, by that time JRM and Barbco had decided to cease continuing the programs being funded by 2002, Ltd. As the purpose of the 2002, Ltd.-JRM contract was to fund the projects with Barbco, once those projects ceased to exist there was no longer any reason for the 2002, Ltd.-JRM agreement to continue.
 {¶ 45} Additionally, the record supports an ongoing relationship between 2002, Ltd. and JRM up until September 5, 2003, as evidenced by a funding deposit of $62,000.00 on August 1, 2003, and additional funding deposits of $14,582.00, $15,370.00 ad $44,000.00 on September 5, 2003.
 {¶ 46} We therefore find that the June 30, 2003, was not a unilateral termination of the agreement between 2002, Ltd. and JRM Limited.
 {¶ 47} Richard Brown's own testimony in response to why he did not choose to continue the program with an alternate funding source, lends support to a finding that the termination was mutual when he stated "I guess I got fed up with the program and wanted to get out of it and didn't want to deal with the issue of inventory funding anymore." (Brown depo. at 101). He also stated that discontinuing the program "was a good business decision." (Id. at 144).
 {¶ 48} We therefore find, upon review of the record, that the trial court had before it some credible, competent evidence supporting its finding of a mutual termination in this matter. *Page 11 
 {¶ 49} Based on the foregoing, we do not find that the trial court's judgment was against the manifest weight of the evidence or erroneous as a matter of law.
 {¶ 50} Appellants' first assignment of error is overruled.
 II. {¶ 51} In their second assignment of error, Appellants argue that the trial court erred in entering judgment against Richard K. Brown, individually. We disagree.
 {¶ 52} Under this assignment of error, Appellants argue that they were entitled to retain any funds received after the alleged breach by Appellee 2002, Ltd. as a setoff against damages for the breach of contract under a theory of recoupment.
 {¶ 53} Having found in the first assignment that Appellee 2002, Ltd. did not breach the contract in the case sub judice, we find Appellants recoupment argument unpersuasive.
 {¶ 54} Appellants next argue that pursuant to the statutory protections provided in R.C. § 1705.48, Appellant Brown is not subject to any form of personal liability for any of the debts of JRM.
 {¶ 55} The trial court found:
 {¶ 56} "The end result of the JRM/02LTD contractual relationship for 02LTD was $140,000 plus in debt for capital funds, and JRM owed 02LTD $133,481.00 for capital funding.
 {¶ 57} "On March 23, 2004, Barbco issued a check to JRM in the amount of $116,480.00 for the sale of boring machine B-54. The check was deposited in JRM's account on March 24, 2004. On March 25, 2004, Mr. Brown notified Dr. Smith that the check for $116,480.00 would be arriving from Barbco by the middle of the following *Page 12 
week. In fact Mr. Brown had deposited the check the day before. In the same letter, Mr. Brown proposed that JRM pay Dr. Smith $14,240.00 and retain $100,000.00 for the start up of a new metal brokering venture. On March 27, 2004 Dr. Smith turned down the new venture and he asked Mr. Brown to apply the full amount to the 02LTD account. On April 16, 2004, Mr. Brown deposited $50,000.00 from the sale of boring machine B-54 in the 02LTD account.
 {¶ 58} "After the April 16, 2004 payment and until all funded inventory was sold, JRM received checks from Barbco totaling $89,470.00 for return of 02LTD capital (JRM removed its capital in year one) and $4,763.15 in fees to be shared between 02LTD and JRM pursuant to their agreement. JRM paid 02LTD $78,560.00 during this same period. From April 16, 2003 until present, JRM retained $77,531.57 of 02LTD money. ($64,240.00 remainder of the B-54 machine sale, plus $10,910.00 return of capital funding, plus $2,381.57 in fees.).
 {¶ 59} Mr. Brown personally channeled JRM funds, which he knew belonged to 02LTD, to pay for his individual debts. Mr. Brown continuously, through August 2005, assured Dr. Smith that 02LTD would be paid off in a few months. The last inventory from the funding project was sold in June of 2005."
 {¶ 60} Upon review of the record, we find that the trial court had before it ample evidence for its finding that Appellants were dishonest in their dealing with Dr. Smith and that Richard Brown engaged in tortious conduct when he converted $77,531.57 of *Page 13 
JRM funds which belonged to 2002, Ltd. Appellants' second assignment of error is overruled.
 {¶ 61} For the foregoing reasons, the judgment of the Court of Common Pleas of Stark County, Ohio, is hereby affirmed.
Hoffman, P. J., and Delaney, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Stark County, Ohio, is affirmed.
 Costs assessed to appellant. *Page 1