Kennedy, J.,
concurring in judgment in part, concurring in paragraph one of the syllabus, and dissenting in part.
{¶ 49} Respectfully, I concur in part and dissent in part. I agree with paragraph one of the syllabus, which merely reiterates R.C. 3314.02(A)(8)(a)’s definition of “operator” as an “organization * * * that manages the daily operations of a community school pursuant to a contract between the operator and the *43 school’s governing authority.” I also concur in the judgment to the extent that it affirms the judgment of the court of appeals. I disagree with paragraphs two and three of the syllabus and dissent from the part of the judgment reversing the judgment of the court of appeals, although it is unclear what part of the judgment it reverses.
{¶ 50} Also, because I believe that a discussion of agency is central to the analysis, I would address the second proposition of law. Finally, I reject the dicta of the opinion asserting that independent contractors can be fiduciaries without any agreement to that effect. This dicta contradicts settled law and appears to be without legal significance here. Also, as a factual matter, I do not believe that ordering an inventory is required because under the contract, the parties titled the personal property upon purchase, and there is no dispute about what is titled to whom. I would affirm the judgment and adopt the reasoning of the court of appeals in all respects.
Facts
{¶ 51} While I agree with the recitation of the facts in the lead opinion as far as it goes, I note that the opinion pays scant attention to the sole focus of this dispute, which is the comprehensive nature of the contract between the parties. By ignoring the contract’s sweep, the lead opinion conflates the roles of the Hope Academy and Life Skills schools (collectively, “Hope Academy”), who are the schools’ governing boards, and the White Hat Management companies, who, by explicit agreement, operate as independent contractors.
{¶ 52} The terms of that agreement are not in dispute. The contracts state that the Hope Academy governing boards are subcontracting all day-to-day management of the schools to the White Hat companies, leaving the governing boards no control over management. Section 14 of the agreement, identified as “Relationship of the Parties,” states, “The parties hereto acknowledge that their relationship is that of an independent contractor. No employee of either party shall be deemed an employee of the other party. Nothing contained herein shall be construed to create a partnership or joint venture between the parties.” In Section 2, the parties agree that Hope Academy will divest itself of control over school management “to the extent permitted by law.” White Hat agrees to provide “all functions relating to the provision of the HOPE Academy Educational Model and the management and operation of the School * * * except for the School accounting, financial reporting and audit functions which will be performed by the designated fiscal officer hired by the Board.” This language, as well as the rest of the contract, reveals that White Hat was granted full responsibility to implement Hope Academy’s educational approach using White Hat’s own expertise to educate students to the satisfaction of the governing board and its sponsors. Hope Academy explicitly subcontracted all management authority *44 over the educational operations of its schools to White Hat, as allowed by R.C. 3314.01(B), reserving no control. Only a fiscal officer, as required by R.C. 3314.011, comes under Hope Academy’s direct authority.
{¶ 53} However, while Hope Academy subcontracted the school’s management to White Hat, the Revised Code does not authorize contracting out financial responsibility to the management company. The parties’ contract, as well as R.C. 3314.011 and 3314.024, requires that financial oversight remains with the sponsors or governing board. For example, management companies, such as White Hat, providing services costing more than 20 percent of the school’s gross annual revenues must “provide a detailed accounting including the nature and costs of the services it provides to the community school.” R.C. 3314.024. And the school’s sponsor, not an independent contractor, must make sure, through contracts executed with its governing board, that its schools comply with a broad array of state education laws to ensure effectiveness, including teacher licensing and academic and financial accountability. R.C. 3314.029(A)(1)(f), (g), (h), and (i) and 3314.03(A)(3), (4), (5), (8), (10), and (11). The law requires transparency. Every contract between a sponsor and a governing board is filed with the state superintendent of public instruction and is available to the public on the Department of Education’s website. R.C. 3314.03.
{¶ 54} The duties that White Hat undertook were comprehensive. The 16-page contract delegates all the governing board’s day-to-day management duties to White Hat, including acquiring buildings, technology, and insurance, complying with all governmental requirements, and hiring and managing personnel. White Hat, not the governing board, covers the entire payroll, and the personnel are employees of White Hat. As with any other school, and as the parties agreed, operating the school required almost the full amount of government dollars allocated to the governing board.
{¶ 55} The lead opinion suggests nefariousness when it asserts that the schools “transferred to White Hat nearly all of the taxpayer dollars they otherwise would have retained for the education of students.” Opinion, ¶ 21. In fact, the Revised Code places limits only on the amount of money that sponsors may retain. “The total amount of * * * payments [to the sponsor] for oversight and monitoring of the school shall not exceed three percent” of revenues for operating expenses. R.C. 3314.03(C). In contrast, the Revised Code authorizes the schools to contract for services in exchange for fees, R.C. 3314.01(B), but does not limit the amounts that governing boards may pay to management companies. However, the governing boards’ resources are limited by statute. R.C. 3314.08(C).
{¶ 56} To be completely accurate, the governing board transferred to Wfiiite Hat not only money but also responsibilities, expenses, and risk. The parties did so specifically “to implement the HOPE Academy Educational Model,” which *45 Hope Academy apparently devised but did not have the expertise or resources to implement. Contrary to the innuendo of the lead opinion, the parties’ agreement did not diminish the amount of funds dedicated to “the education of students” because Hope Academy did not retain any responsibility for educating students.
{¶ 57} The only issue now is whether that part of the contract between the parties addressing ownership of property is void.
{¶ 58} A complete recitation of the propositions of law will bring these matters into sharper focus.
Proposition of Law I
{¶ 59} Proposition of law I, which was not presented to the court of appeals as an assignment of error, reads as follows:
Public funds paid to a private entity exercising a government function, such as the operation of a community school, retain their character as public funds even after they are in the possession and control of the private entity. Although the private entity may earn a profit out of the public funds, such profit is earned only after the private entity has fully discharged its contractual, statutory, and fiduciary obligation.
{¶ 60} As a preliminary matter, I do not take the second sentence of this or the third proposition to suggest that our holding must apply uniquely to for-profit entities. The lead opinion should make clear that funds transferred pursuant to a valid contract are earned according to the terms of that contract, regardless of whether the contracting entities operate for profit.
{¶ 61} Otherwise, the proposition is easily rejected. State ex rel. Oriana House, Inc. v. Montgomery, 108 Ohio St.3d 419, 2006-Ohio-1325, 844 N.E.2d 323, cited by Hope Academy, does not support its position. That case merely holds that the state auditor may audit private entities receiving public funds. Id. at ¶ 1, 27. It does not hold that a private company can never retain property titled in its name when the property is- purchased with public funds. Oriana House does state that “[individuals or entities have a duty to account for their handling of those funds,” id. at ¶ 13, but accountability is not the issue here. At most, Oriana House can be cited for the proposition that when a private entity receives public funds to perform a government function, it is subject to audit by the state auditor. Id. at ¶ 15. White Hat acknowledges that it is subject to audit under R.C. 3314.024 and that it has, in fact, been audited.
{¶ 62} In addition, Hope Academy cites no binding authority that actually supports its statement that public funds do not automatically lose their public character when they are transferred to a private entity. By contrast, White Hat *46 cites authority very much on point. In State ex rel. Yovich v. Cuyahoga Falls City School Dist Bd. of Edn., 10th Dist. Franklin No. 91AP-1325, 1992 WL 142263, *2 (June 23, 1992), the court held that public funds “lost their chief characteristic of ‘public funds’ once the funds came into possession and control of * * * a private entity.” The funds here, like those in Yovieh, were initially public, but were used by a public entity to pay a private entity for services rendered to a school, and the private entity used those funds to pay the persons actually rendering the service. And like the funds in Yovieh, the funds in this case were spent by a private corporation “whose funds were not controlled or held by” the public entity. Id. The court in Yovieh then “rejected] the contention that [the provider of the service] was paid with public funds.” Id. Hope Academy offers nothing persuasive in support of a different result.
{¶ 63} The lead opinion invokes Cordray v. Internatl. Preparatory School, 128 Ohio St.3d 50, 2010-Ohio-6136, 941 N.E.2d 1170, ¶ 25, to claim that White Hat was receiving public funds from Hope Academy “under color of office.” Therefore, according to the majority, the buy-back pi-ovision of the contract “does not seem supportable,” although it was “an agreed-upon term.” Opinion at ¶ 34. However, as recited above, Hope Academy has its own fiscal officers, and White Hat and Hope Academy agreed that White Hat is an independent contractor. Nor, as I discuss under the next proposition of law, does White Hat fit the legal definition of “agent” for the schools. Therefore, White Hat cannot be receiving public funds “under color of office” in any way that would put the legitimacy of the contract into question.
{¶ 64} Notwithstanding my concerns about the lead opinion’s analysis of the first proposition of law, I concur in its ultimate holding that the parties legitimately agreed that White Hat would own all property that it purchased with the money that Hope Academy provided as the continuing fee. As the lead opinion concludes, the contract is enforceable.
Proposition of Law II
{¶ 65} The lead opinion does not address Hope Academy’s second proposition of law, but it is central to a full analysis of whether Cordray is relevant. Therefore, it should be addressed. Proposition of law II reads as follows:
When a private entity uses funds designated by the Ohio Department of Education for the education of public-school students to purchase furniture, computers, software, equipment, and other personal property to operate a community school, the private entity is acting as a purchasing agent and the property must be titled in the name of the community school.
*47 {¶ 66} I note first that this proposition applies only to property that White Hat bought with the continuing fee. White Hat essentially concedes that it operated as a purchasing agent when it used grant money to purchase property that had to be titled in the schools’ name.
{¶ 67} I begin with longstanding tenets of principal-agency law. First, a principal-agency relationship is created by agreement:
(1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.
(2) The one for whom action is to be taken is the principal.
(3) The one who is to act is the agent.
Restatement of the Law 2d, Agency, Section 1 (1958). However, the parties agreed in their contract that White Hat was an independent contractor. An “independent contractor” is defined as follows:
An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other’s right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent.
(Emphasis added.) Restatement of Agency, Section 2(3). See also Soberay Mach. & Equip. Co. v. MRF Ltd., Inc., 181 F.3d 759, 767 (6th Cir.1999) (“[ujnder the Restatement (Second) of Agency, which Ohio has adopted, an independent contractor may also be an agent”).
{¶ 68} To determine whether White Hat, an independent contractor, is also an agent, we must apply the test of Councell v. Douglas, 163 Ohio St. 292, 126 N.E.2d 597 (1955), paragraph one of the syllabus:
The relationship of principal and agent or master and servant is distinguished from the relationship of employer and independent contractor by the following test: Did the employer retain control of, or the right to control, the mode and manner of doing the work contracted for? If he did, the relationship is that of principal and agent or master and servant. If he did not but is interested merely in the ultimate result to be *48 accomplished, the relationship is that of employer and independent contractor.
{¶ 69} Review of the contract clearly shows that the governing boards conferred on the White Hat companies “all functions” relating to management of the schools, leaving the governing boards no control over management. The motive was to implement Hope Academy’s educational model. However, as stated above, Hope Academy wanted no responsibility for or control over the implementation. It contracted, “to the extent permitted by law, * * * all functions relating to the provision of the HOPE Academy Educational Model and the management and operation of the School” except for fiscal matters. This language, as well as the rest of the contract, reveals that White Hat was retained to implement Hope Academy’s educational approach as it saw fit. Hope Academy’s interest was the “ultimate result to be accomplished,” i.e., properly educating children, while subcontracting control to White Hat. Under Ohio law, then, White Hat is an independent contractor and not an agent of the governing boards.
Proposition of Law III
{¶ 70} Proposition of law III reads as follows:
A private entity that agrees to operate all functions of a community school has a fiduciary relationship with the community school. Although the private entity may earn a profit for the services it provides, it must act primarily for the benefit of the community school.
{¶ 71} All contracts contain an implied duty of good faith. Ed Schory & Sons, Inc. v. Soc. Natl. Bank, 75 Ohio St.3d 433, 443, 662 N.E.2d 1074 (1996). However, “[a] ‘fiduciary relationship’ is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.” In re Termination of Emp. of Pratt, 40 Ohio St.2d 107, 115, 321 N.E.2d 603 (1974).
{¶ 72} First, I emphatically disagree with the assertion that a fiduciary duty exists between the parties here. Paragraphs two and three of the syllabus are especially confusing because they are wholly dicta, with no identified relevance to this case and therefore with uncertain application in the future. I would note that the lead opinion’s rationale actually suggests that it is Hope Academy who violated its fiduciary duty to the citizens of Ohio by foolishly subcontracting its educational duties to White Hat.
*49 {¶ 73} The black-letter law on fiduciary relationships also contradicts the third proposition of law. First, fiduciary relationships are established by agreement. The agreement here identified White Hat as an independent contractor. “Under Ohio law, there is generally no fiduciary relationship between an independent contractor and his employer unless both parties understand that the relationship is one of special trust and confidence.” Schulman v. Wolske & Blue Co., L.P.A., 125 Ohio App.3d 365, 372, 708 N.E.2d 753 (10th Dist.1998). No evidence exists here that a special relationship was understood, and the parties’ written agreement demonstrates otherwise.
{¶ 74} Furthermore, a fiduciary relationship cannot be created by the principal alone. “A fiduciary relationship need not be created by contract; it may arise out of an informal relationship where both parties understand that a special trust or confidence has been reposed.” (Emphasis added.) Stone v. Davis, 66 Ohio St.2d 74, 78, 419 N.E.2d 1094 (1981). Hope Academy does not identify any agreement that a fiduciary relationship was established either in the written contract or by mutual understanding, and neither does the lead opinion.
{¶ 75} Finally, Renaissance Academy for Math & Science of Missouri, Inc. v. Imagine Schools, Inc., W.D.Mo. No. 4:13-CV-00645-NKL, 2014 WL 7267033 (Dec. 18, 2014), does not support the lead opinion’s theory. In Renaissance, a judge determined, after a week-long trial, that under the extremely unusual facts of that case, the charter-school management company had had a fiduciary relationship with the charter school. To reach this conclusion, the judge applied the five-factor test under Missouri law for fiduciary relationships. The first factor requires showing one dominant and one subservient mind “as a result of age, state of health, illiteracy, mental disability, or ignorance.” Id. at *1.
{¶ 76} The evidence before the judge showed that the members of the governing board were “not qualified to run a charter school,” that they were “weak and confused,” and that in fact, the management company had recruited those very board members because they were weak and pliable rather than independent and dominant. Id. at *2. The management company obstructed the board’s access to the information it needed, pressured and manipulated the board members, and exerted such complete control over the board that there was a “surrender of independence” by the board. Id. at *3. The judgment was not appealed. Renaissance does not stand for the assertion that operators are always fiduciaries, and no one is claiming that Hope Academy is weak, incompetent, or submissive to White Hat to the point of surrender.
{¶ 77} For the above reasons, I respectfully concur in the lead opinion only to the extent that it affirms the judgment of the court of appeals.
French, J., concurs in the foregoing opinion.