[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 433.]

ED SCHORY & SONS, INC. ET AL., APPELLEES, *v*. FRANCIS ET AL., APPELLEES AND CROSS-APPELLANTS; SOCIETY NATIONAL BANK ET AL., APPELLANTS AND CROSS-APPELLEES.

[Cite as *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 1996-Ohio-194.]

*Debtor and creditor—Advice given by creditor to debtor in a commercial context in which the parties deal at arm's length is insufficient to create a fiduciary relationship.*

————————————

Advice given by a creditor to a debtor in a commercial context in which the parties deal at arm's length, each protecting his or her respective interests, is insufficient to create a fiduciary relationship. (*Umbaugh Pole Bldg. Co. v. Scott* [1979], 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320, followed.)

————————————

(No. 94-2201—Submitted January 23, 1996—Decided April 24, 1996.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Stark County, No. 9474.

————————————

{¶ 1} This appeal and cross-appeal arise from various defaults on certain obligations owed by appellees and cross-appellants, Frank P. Francis ("Francis") and Francis General Construction, Inc. ("FGC") to appellees Robert G. Schory, Jr. ("Schory") and Ed Schory & Sons, Inc. ("Schory & Sons") and obligations owed by Francis and FGC to appellant and cross-appellee, Society National Bank ("Society"). Francis is the president and owner of FGC, and Schory is the president of Schory & Sons.

North Whipple Avenue Mall Project

{¶ 2} In 1988, Schory and Francis decided to construct a strip mall on North Whipple Avenue in North Canton, Ohio. Schory and Francis had previously entered into a partnership for the purpose of developing certain real estate in the Summit County area. The North Whipple Avenue mall was financed through the Central Trust Company ("Central Trust"). Francis was the general contractor for the project.

{¶ 3} While working on the North Whipple Avenue mall, Francis was also involved in a multiphase condominium development referred to as the Sherbrook development ("Sherbrook"). Schory was not involved in Sherbrook. During the construction of the North Whipple Avenue mall, Francis took certain funds applicable to that project and applied them to the Sherbrook development. Francis falsified various lien releases to obtain the money.

{¶ 4} As a result of the misappropriation of certain funds, Schory and Schory & Sons sued Francis and FGC in the Stark County Court of Common Pleas. Thereafter, the parties entered into a settlement agreement, and, pursuant to the agreement, Francis, individually and on behalf of FGC, signed a cognovit note in the amount of $130,000. The note was secured by certain mortgage deeds. Francis and FGC eventually defaulted on their obligations contained in the note, and a judgment was obtained against them. The parties then entered into an amended settlement agreement. In this agreement, Francis and FGC agreed to pay certain sums to Schory and Schory & Sons. In return, Schory and Schory & Sons agreed not to institute a foreclosure action against Francis and FGC. The amended agreement also included a letter, dated May 1, 1991, which was attached to the agreement as an exhibit. In the letter, Francis admitted that he had "fraudulently misappropriated" certain funds involving the partnership arrangement.

{¶ 5} However, Francis and FGC failed to abide by the terms of this new agreement. They have again defaulted on certain payments owed to Schory and Schory & Sons.

Sherbrook Development

{¶ 6} As stated above, while Francis was associated with Schory, Francis was also involved in the Sherbrook development. During the summer of 1988, Francis approached Society to obtain financing for his proposed multiphase development. Francis met with a commercial real estate loan officer for Society, H. Michael Crowl. Francis had dealt with Crowl on prior occasions involving other projects. They discussed various aspects of the development. Francis explained to Crowl that Sherbrook would involve approximately twelve separate buildings comprising thirty-six to forty-two units, that he would need "in the area of $2.5 to $3 million," and that the development would take two to three years to complete. Francis elected to divide Sherbrook into separate phases for purposes of financing and completion.

{¶ 7} After discussing the project with Crowl, Francis submitted an application to Society's Loan Committee. In the application, Francis requested loans for the first phase of the development. Specifically, he requested an acquisition and development loan ("A&D loan"), a loan for the construction of a three-unit building, and a loan for the construction of a four-unit building. The two requested construction loans were separate from each other and from the A&D loan. The committee approved the loans, and Society sent Francis a commitment letter dated October 5, 1988. In the letter, Society indicated to Francis that future construction loans regarding additional phases of the development would not automatically be forthcoming. Society set forth various requirements for the approved loans, and it also described in the letter certain contingencies and requirements necessary for consideration of future construction loans. Francis signed the letter, agreeing to its terms and conditions.

**{¶ 8}** Pursuant to the commitment, Francis and FGC, on November 4, 1988, entered into certain written agreements with Society. It appears that each construction loan approved by Society and received by Francis involved the execution of a promissory note, a construction loan agreement, and a mortgage deed or deeds to secure the indebtedness.[1] Francis completed construction of the first phase (buildings one and two) of the development in 1989.

**{¶ 9}** Francis also obtained loans from Society for the construction of other buildings. These buildings (three, four, five and six) involved different phases of the project. It appears that the procedure for obtaining the construction loans for these buildings was the same as that utilized in the initial phase of the project: Francis would apply for a construction loan, the committee would review the request, and, upon approval, Society would send Francis a commitment letter to sign; Francis would then enter into written agreements with Society, *i.e.*, a construction loan agreement and a promissory note for each construction loan. The loan agreements and notes set forth the terms and conditions of each loan. Each loan was secured by a mortgage deed.

**{¶ 10}** In June 1990, Francis requested financing from Society to construct another phase of the project (buildings seven and eight). Society sent Francis a commitment letter dated September 26, 1990, which he signed. On October 5, 1990, Francis, on behalf of FGC, entered into a construction loan agreement with Society. Francis signed a promissory note in connection with this loan individually and on behalf of FGC.

**{¶ 11}** Francis ran out of money during this phase of the project. After discussing the situation with Society, a "Loan Modification Agreement" was prepared by the bank. However, because the agreement contained a provision

---

1. While there may also have been an A&D loan to Francis, there are no documents in the record with regard to it.

4

releasing Society from certain potential liabilities, Francis did not sign the agreement.

{¶ 12} In 1991, appellant and cross-appellee, Kurt L. Reiber, became involved in the financial dealings of Sherbrook. Reiber is employed by Society as a senior vice president and manager of the Commercial Banking Division. In August 1991, Reiber, Crowl, Francis and another individual met to discuss the possibility of completing the development. According to Reiber, at this meeting he explained to Francis that "the terms offered to FGC, Inc. for the prior loans would not be the terms and conditions for the loans for additional buildings or phases, that the presale requirements which were reduced to writing for the earlier loans were requirements only for those loans and that new and additional requirements would be made for phase V loans, and that the terms of the loan for phase V of the project would be set forth in a commitment letter which would be issued subsequent to this meeting."

{¶ 13} Following the August 1991 meeting, Reiber sent Francis a letter dated August 14, 1991. In the letter, Society offered Francis a loan in the amount of $400,000. The terms and conditions of this loan were different from the terms of the other loans. Francis declined to accept the loan. Sherbrook was not completed, and Francis and FGC defaulted on various obligations owed to Society.

### Legal Proceedings

{¶ 14} On September 5, 1991, Schory & Sons filed a foreclosure action against Francis and FGC in the court of common pleas. In the complaint, Schory & Sons named as defendants Francis, FGC, Society, and others believed to have an interest in certain mortgage deeds held by Schory & Sons. Society filed an answer and a cross-claim against Francis and FGC, asserting its respective interests in the properties in question.

{¶ 15} On December 4, 1991, Francis and FGC filed an answer and a counterclaim against Schory & Sons and a third-party complaint against Schory.

In the counterclaim and third-party complaint, Francis and FGC alleged that "[u]nder threat of foreclosure and other serious economic consequences," Schory & Sons and Schory had compelled Francis to sign an apology letter "confessing to fraudulent misapplication of funds in connection with certain partnerships." Francis and FGC further alleged that the contents of the letter were false and that it had been improperly disseminated to various individuals. In this regard, Francis and FGC set forth claims for economic duress, defamation, malicious prosecution and intentional infliction of severe emotional distress.

{¶ 16} Also on December 4, 1991, Francis and FGC filed an answer and a cross-claim against Society and a third-party complaint against Reiber. In this cross-claim and third-party complaint, Francis and FGC alleged, essentially, that Society had agreed to finance the entire development under specified terms and conditions, that these terms and conditions had been agreed upon prior to or around the time of the disbursements of the A&D loan and the initial two construction loans, and that Society had failed to abide by the agreed-upon "basic terms" and conditions when disbursing additional construction loans. Francis and FGC also averred that at the time Society agreed to finance the development Society was aware that Francis owned various real estate properties not associated with Sherbrook, and that the success of Sherbrook depended upon prompt disbursements of the construction loans. Francis and FGC further charged that Society nevertheless failed to disburse certain loans in a prompt fashion, and, as Sherbrook progressed, required Francis, at times, to reduce his overall indebtedness and liquidate certain properties not associated with the development. Based on these allegations, Francis and FGC set forth claims for, among other things, breach of contract, promissory estoppel, fraud (which the parties now treat as a claim of negligent misrepresentation), breach of an implied duty of good faith, breach of a fiduciary relationship, and intentional and/or negligent infliction of severe emotional distress.

6

{¶ 17} On April 30, 1993, the court dismissed the claims against Reiber. On August 6, 1993, the trial court granted motions for summary judgment in favor of Schory & Sons, Schory, and Society. On August 30, 1994, the Court of Appeals for Stark County affirmed the judgment of the trial court in part and reversed it in part. From that judgment, Society and Reiber appealed. Francis and FGC cross-appealed.

{¶ 18} This cause is now before this court upon the allowance of a discretionary appeal and cross-appeal.

_____

*Baker, Meekison & Dublikar*, *Jack R. Baker* and *Gregory A. Beck*, for appellees Robert Schory and Schory & Sons, Inc..

*Thomas & Boles*, *Stephen G. Thomas* and *Gretchen A. Hirschauer*, for appellees and cross-appellants, Francis and FGC.

*Day, Ketterer, Raley, Wright & Rybolt*, *Louis A. Boettler*, *John A. Murphy, Jr.* and *Cari Fusco Evans*, for appellants and cross-appellees.

_____

**DOUGLAS, J.**

{¶ 19} The court of appeals affirmed the trial court's judgment granting summary judgment in favor of Schory & Sons and Schory on all claims asserted against them by Francis and FGC. The court also affirmed the portion of the trial court's judgment granting summary judgment in favor of Society and Reiber with respect to all contract-based claims advanced against them by Francis and FGC, finding that these claims were barred by the Statute of Frauds or the parol evidence rule. However, the court of appeals held that the trial court had erred in granting summary judgment in favor of Society and Reiber and against Francis and FGC on the claims of negligent misrepresentation, breach of an implied duty of good faith, breach of a fiduciary relationship, and intentional and/or negligent infliction of severe emotional distress.

{¶ 20} Society and Reiber have appealed certain issues to this court, and Francis and FGC have filed a cross-appeal with respect to other issues. For the sake of convenience, and where applicable, we will hereinafter refer to Society and Reiber collectively as Society, and refer to Francis and FGC collectively as Francis. Further, we will use "Schory" to refer to both Schory & Sons and Robert G. Schory, Jr.

I

Society and Francis

{¶ 21} The parties involved in this appeal and cross-appeal have set forth an array of issues for our consideration. Francis contends that material issues of fact exist as to whether Society breached a contract to finance the entire Sherbrook development. Francis claims that the facts of this particular case warrant a finding that such a contract was entered into between the parties, and that the contract was not subject to, or, alternatively, not barred by the Statute of Frauds. Francis also requests that we affirm the judgment of the court of appeals regarding the claims for negligent misrepresentation, breach of an implied duty of good faith, breach of a fiduciary relationship, and intentional and/or negligent infliction of severe emotional distress.

{¶ 22} Society, on the other hand, suggests that many, if not all, of the claims asserted by Francis are merely improper attempts to seek enforcement of certain alleged oral statements. Society contends that it did not enter into a contract with Francis to finance the entire project but, rather, that the development was divided into separate phases for purposes of completion and financing. Society also asserts that Francis's "attempt to enforce the alleged oral agreements which are contradicted by subsequent written loan agreements is prohibited by the Statute of Frauds and parol evidence rule."

A

Breach of Contract

{¶ 23} In Ohio, the Statute of Frauds is embodied in R.C. Chapter 1335. At issue here are R.C. 1335.04 and 1335.05. These statutes state, respectively, in part, that:

"No lease, estate, or interest, either of freehold or term of years, or any uncertain interest of, in, or out of lands, tenements, or hereditaments, shall be assigned or granted except by deed, or note in writing, signed by the party assigning or granting it * * *."

"No action shall be brought whereby to charge * * * a person * * * upon a contract or sale of lands, tenements, or hereditaments, *or interest in or concerning them,* or upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, *is in writing and signed by the party to be charged* therewith or some other person thereunto by him or her lawfully authorized." (Emphasis added.)

{¶ 24} R.C. 1335.05 clearly requires that "no action shall be brought" regarding an "interest in or concerning" land unless the agreement upon which the action is based is in writing and signed by the defendant. See *Marion Prod. Credit Assn. v. Cochran* (1988), 40 Ohio St.3d 265, 273, 533 N.E.2d 325, 333. The record in the case at bar does not contain any writing signed by Society which evidences that Society agreed to finance the entire development. Rather, the record reveals that the parties entered into a series of separate written agreements, involving different phases of the development. Francis had sought financing from Society for a multiphase development.

{¶ 25} In this case, Francis met initially with Crowl and they discussed various aspects of the project. Francis explained to Crowl that the development would consist of numerous buildings, and that it would take between two and three years to complete. A formal application *regarding the first phase* of the development was submitted to Society. In the application, Francis requested an A

& D loan and two separate construction loans. The committee approved the requests, and Society sent Francis a commitment letter. In the letter, Society informed Francis that it had approved the loans. The letter also included various terms and conditions that would be applicable to *those* particular loans. Additionally, in the letter, Society explained to Francis that "[a]t least two of the three condominiums must be sold *before any consideration for another construction loan will be given*." (Emphasis added.) Francis signed the letter, agreeing to the terms set forth therein. Thereafter, Francis and Society closed the loans and, in doing so, the parties entered into various written agreements, *i.e.*, construction loan agreements and promissory notes which refer to certain mortgages. This procedure was apparently repeated each time Francis constructed additional buildings involving different phases of the development.

{¶ 26} Indeed, the record belies Francis's contention that Society agreed to finance the entire project. Instead, it is evident that the parties intended to divide the project into phases for purposes of completion and financing. The parties entered into a series of written agreements. In this regard, Society could not have breached a contract to finance the entire development because such a contract simply did not exist. Even if it did exist as alleged by Francis, it was not in writing and signed by Society. Thus, Francis's breach of contract action is barred by the Statute of Frauds.

B

Promissory Estoppel and Negligent Misrepresentation

{¶ 27} Francis also claims that he is entitled to relief under the equitable doctrine of promissory estoppel and the tort of negligent misrepresentation. This court has adopted the doctrine of promissory estoppel as set forth in the Restatement of the Law 2d, Contracts (1981), Section 90. See *McCroskey v. State* (1983), 8 Ohio St.3d 29, 8 OBR 339, 456 N.E.2d 1204. Further, we also recognize the tort of negligent misrepresentation. See *Hadden View Invest. Co. v. Coopers &*

*Lybrand* (1982), 70 Ohio St.2d 154, 156, 24 O.O.3d 268, 269, 436 N.E.2d 212, 214. See, also, *Gutter v. Dow Jones, Inc.* (1986), 22 Ohio St.3d 286, 22 OBR 457, 490 N.E.2d 898. However, we find that these claims are barred by the parol evidence rule.

{¶ 28} "The Parol Evidence Rule was developed centuries ago to protect the integrity of written contracts." Shanker, Judicial Misuses of the Word Fraud to Defeat the Parol Evidence Rule and the Statute of Frauds (With Some Cheers and Jeers for the Ohio Supreme Court) (1989), 23 Akron L.Rev. 2. The parol evidence rule is a rule of substantive law that prohibits a party who has entered into a written contract from contradicting the terms of the contract with evidence of alleged or actual agreements. *Id.* "When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." 3 Corbin, Corbin on Contracts (1960) 357, Section 573. See, also, *Charles A. Burton, Inc. v. Durkee* (1952), 158 Ohio St. 313, 49 O.O. 174, 109 N.E.2d 265.

{¶ 29} As is apparent from the foregoing, the parol evidence rule will not be overcome by merely alleging that a statement or agreement made prior to an unambiguous written contract is different from that which is contained in the contract. Stated differently, "an oral agreement cannot be enforced in preference to a signed writing which pertains to exactly the same subject matter, yet has different terms." *Marion*, *supra*, 40 Ohio St.3d 265, 533 N.E.2d 325, paragraph three of the syllabus.

{¶ 30} In the case before us, Francis has indeed proffered evidence extrinsic to the various applicable written agreements entered into with Society, and accordingly the parol evidence rule is applicable. A review of the alleged oral promises at issue, compared to the various written agreements signed by Francis,

establishes that the terms of the alleged oral agreements pertain to the very same subject matter as the terms of the written agreements -- the financing of Sherbrook.

{¶ 31} In his affidavit, Francis stated: "He [Crowl] confirmed the available interest rates, that financing would be available for the whole project at 75 percent of appraised value, and that my personal properties would not need to be sold as a condition of loans to my corporation. * * * On numerous occasions, Mike Crowl told me that he would be able to process loans promptly, certainly within 30 days from approval and title to closing, and that when he was unable do so, it was because loan approvals were delayed in Cleveland after Society Bank of Eastern Ohio N.A. was merged into Society Bank of Cleveland in 1989. * * * Based on these offers and my prior agreement with Mike Crowl, I requested a loan in late March, 1989 of $390,000 to finance construction of Phase II A. Although I had presold units in Phase II A in reliance upon prompt loan approvals, that loan was not approved until August 30, 1989. * * * I have been lead [sic. led] to believe by Mike Crowl that regional officials in Cleveland knew of the local policies, based upon which Canton had committed to finance the Sherbrook project, but that the officials in Cleveland refused to honor the commitments made to me."

{¶ 32} These alleged representations made by Society to Francis were antecedent to the various applicable written agreements entered into between the parties. Prior to obtaining the actual loan proceeds, Francis would sign a commitment letter, and the parties would then execute a construction loan agreement and promissory note for each loan. These written agreements set forth the terms of, and conditions for, each respective loan, as well as the obligations and liabilities of the parties. Specifically, each promissory note set forth the amount advanced for each loan, and that interest for each loan would be calculated from the date of the note at a floating rate equal to one and one-half percent in excess of the prime rate. Each construction loan agreement also set forth the amount advanced and, additionally, stated that "Society shall have no liability or obligation

12

whatsoever in connection with said improvements or the construction or completion thereof or work performed thereon, nor shall it have any obligation except to advance the Loan proceeds as herein agreed." Moreover, each construction loan provided that "Society may establish additional requirements prior to disbursements," and that "Society or its counsel shall be entitled, from time to time, to establish additional requirements or to require the execution of additional documents * * *." Further, each construction loan provided that "[t]he Loan proceeds shall be debited to Owner's Loan upon the date of each disbursement * * *."

**{¶ 33}** The parol statements alleged by Francis involve precisely the same subject matter as the various applicable written agreements. As was aptly stated by former Chief Justice Taft in *Dice v. Akron, Canton & Youngstown RR. Co.* (1951), 155 Ohio St. 185, 191, 44 O.O. 162, 164, 98 N.E.2d 301, 304, reversed on other grounds (1952), 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398: "A person of ordinary mind cannot say that he was misled into signing a paper which was different from what he intended to sign when he could have known the truth by merely looking when he signed. * * * If this were permitted, contracts would not be worth the paper on which they are written. If a person can read and is not prevented from reading what he signs, he alone is responsible for his omission to read what he signs."

**{¶ 34}** Accordingly, we believe that summary judgment was properly granted by the trial court in favor of Society on Francis's claims for promissory estoppel and negligent misrepresentation.

C

Fiduciary Relationship

{¶ 35} Francis also contends that genuine issues of material fact exist whether a fiduciary relationship existed between the parties and whether Society breached this relationship. We disagree.

{¶ 36} The term "fiduciary relationship" has been defined by this court as a relationship "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *In re Termination of Employment of Pratt* (1974), 40 Ohio St.2d 107, 115, 69 O.O.2d 512, 517, 321 N.E.2d 603, 609. In considering this issue in the context of a debtor and creditor relationship, this court held, in *Umbaugh Pole Bldg. Co. v. Scott* (1979), 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320, paragraph one of the syllabus, that: "*The relationship of debtor and creditor without more is not a fiduciary relationship*. A fiduciary relationship may be created out of an informal relationship, but this is done only when both parties understand that a special trust or confidence has been reposed." (Emphasis added.) See, also, *Blon v. Bank One, Akron, N.A.* (1988), 35 Ohio St.3d 98, 519 N.E.2d 363, paragraph two of the syllabus.

{¶ 37} In *Umbaugh*, a credit association loaned money to the Scotts for the purpose of expanding their hog operation. The association took a security interest in the Scotts' hogs and certain equipment and a mortgage on the Scotts's real estate. During the term of the loan, the Scotts contracted for certain buildings to be constructed that were not the subject of any loan agreement made with the lender, but were items the Scotts had hoped the association would advance funds for in the future. The association gave advice and counseling to the Scotts relative to their farming business, including suggesting that the Scotts liquidate some of their assets so that they would be able to make payments on their home and maintain a scaled-down farming operation. The lender later advised the Scotts to sell their farm

equipment and hogs covered by the security agreement. The parties agreed to use a particular auctioneer to conduct the sale. Following the filing of a foreclosure action by another creditor, the Scotts sued the association, asserting that the association had established for them a line of credit. In considering whether the giving of advice by a creditor to a debtor can transform an arm's-length transaction into one involving a fiduciary relationship, we held that:

"***But here the offering and giving of advice was insufficient to create a fiduciary relationship. While the advice was given in a congenial atmosphere and in a sincere effort to help the Scotts prosper, nevertheless, the advice was given by an institutional lender in a commercial context in which the parties dealt at arms length, each protecting his own interest." *Id*., 58 Ohio St.2d at 287, 12 O.O.3d at 282, 390 N.E.2d at 323.

{¶ 38} As can be gleaned, this court's holding in *Umbaugh,* stands for the proposition that advice given by a credit to a debtor in a commercial context in which the parties deal at arm's length, each protecting his or her respective interests, is insufficient to create a fiduciary relationship. In the case before us, Francis has failed to demonstrate that Society was not acting solely in its own interest. In fact, the record indicates that Society, at all times, acted to protect its own interest, and "neither party had, nor could have had, a reasonable expectation that the creditor [Society] would act solely or primarily on behalf of the debtor [Francis]." *Id*.

{¶ 39} Furthermore, Francis was an experienced developer. Francis testified that he had been in the construction and building business for twenty years, that he had been involved in "thousands" of loans, and that he had built numerous residential dwellings and commercial buildings. Francis was obviously aware of the risks associated with a multiphase development such as Sherbrook and, specifically, what could happen if units in such a development did not sell as fast as expected.

**{¶ 40}** In light of the foregoing, we find that a fiduciary relationship did not exist between the parties. Therefore, summary judgment was properly entered by the trial court in favor of Society on Francis' claim for breach of a fiduciary relationship.

D

Bad Faith

**{¶ 41}** Pleading further in the cross-claim and third-party complaint against Society, Francis also asserted that Society acted in bad faith and breached its obligation of good faith, thereby damaging Francis.

**{¶ 42}** Francis did not allege that Society breached the explicit terms of the written agreements. Society's decision to enforce the written agreements cannot be considered an act of bad faith. Indeed, Society had every right to seek judgment on the various obligations owed to it by Francis and to foreclose on its security. As the Seventh Circuit Court of Appeals stated in *Kham & Nate's Shoes No.2, Inc. v. First Bank of Whiting* (C.A.7, 1990), 908 F.2d 1351,1357-1358:

"Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.' Although courts often refer to the obligation of good faith that exists in every contractual relation, * * * this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document. 'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.

"* * *

"Although Bank's decision left Debtor scratching for other courses of credit, Bank did not create Debtor's need for funds, and it was not contractually obliged to satisfy its customer's desires. The Bank was entitled to advance its own interests, and it did not need to put the interests of Debtor * * * first. To the extent

*K.M.C., Inc. v. Irving Trust Co*., 757 F.2d 752, 759-63 (6th Cir.1986), holds that a bank must loan more money or give more advance notice of termination than its contract requires, we respectfully disagree. First Bank of Whiting is not an eleemosynary institution. It need not throw good money after bad, even if other persons would catch the lucre. See, also, *Bennco Liquidating Co. v. Ameritrust Co. Natl. Assn.* (1993), 86 Ohio App.3d 646, 621 N.E.2d 760; and *Metro. Life Ins. Co. v. Triskett Illinois, Inc*. (1994), 97 Ohio App.3d 228, 646 N.E.2d 528.

**{¶ 43}** It is undisputed that Society fully performed its obligations under the various written agreements. In fact, when Francis ran out of money during the construction of buildings seven and eight, Society offered to lend Francis additional funds. Society, however, was under no obligation to make this offer. Society did nothing more than stand on its right to require payment of Francis's contractual obligations. Thus, we find that Francis's claim for breach of an implied duty of good faith was properly dismissed by the trial court.

E

Emotional Distress

**{¶ 44}** Finally, Francis alleges that Society's actions constitute intentional and/or negligent infliction of severe emotional distress. However, in light of our findings above, we reject Francis's argument that genuine issues of material fact exist with respect to these claims. These claims are wholly unsupported by the record. Further, there simply is no basis to find that Francis endured the type of mental anguish and suffering subject to judicial redress.

II

Schory and Francis

**{¶ 45}** The claims asserted by Francis in his counterclaim and third-party complaint against Schory are premised upon the May 1, 1991 letter, which was part of the amended settlement agreement between the parties. The letter, addressed to Schory and signed by Francis, stated:

"I am sincerely sorry for all the grief and aggravation I have caused you and your family. I acknowledge by this letter that I fraudulently misappropriated the sum of $370,000.00 from the Arlington General Partnership on the Arlington Road and Whipple Avenue Projects. This was done by knowingly misrepresenting the construction expenses of Francis General Construction, Inc. I regret any problems which I may have caused your family and your business. I also apologize for filing the counterclaim and calling the police."

A

Defamation

**{¶ 46}** After receiving the May 1, 1991 letter from Francis, Schory showed the letter to certain individuals. Francis admits to writing and signing the letter but, curiously, claims that the contents of the letter are false. Francis asserts that the amount misappropriated from the partnership was actually less than $370,000. Therefore, somewhat disingenuously, Francis urges that a genuine issue of fact exists as to whether the letter was false and defamatory.

**{¶ 47}** However, the matter at issue is not the amount that was actually taken by Francis but, rather, whether Francis misappropriated certain funds from the partnership. Francis admitted that he improperly took funds belonging to the partnership.

**{¶ 48}** In Ohio, truth is a complete defense to a claim for defamation. R.C. 2739.02 states: "In an action for a libel or a slander, the defendant may allege and prove the truth of the matter charged as defamatory. *Proof of the truth thereof shall*

*be considered a complete defense.* In all such actions any mitigating circumstances may be proved to reduce damages." (Emphasis added.) See, also, *Shifflet v. Thomson Newspapers, Inc.* (1982), 69 Ohio St.2d 179, 183, 23 O.O.3d 205, 207, 431 N.E.2d 1014, 1017 ("Since truth is always a defense in any action for libel or slander, appellants' claim on these grounds must fail." [Footnote omitted.]).

{¶ 49} In considering the letter at issue, the court of appeals held that "[s]ummary judgment was properly granted on the issue of 'truth.'" We agree with the findings of the trial court and the court of appeals that the truth of the letter negated the alleged libel claim set forth by Francis. Thus, we find that Schory was entitled to summary judgment pursuant to Civ.R. 56.

B

Malicious Prosecution

{¶ 50} Francis also set forth a claim for malicious civil prosecution. Francis, however, has since elected to reclassify the claim as one for abuse of process. In any event, we find that both claims lack merit.

{¶ 51} Schory had every right to file a foreclosure action against Francis. Prior to filing this action, the parties were involved in ongoing legal proceedings that eventually led to an initial settlement between the parties. Francis agreed to pay Schory $130,000. Francis, however, defaulted on payments owed, and Schory obtained a judgment against Francis. The parties then entered into an amended settlement agreement. In this new agreement, Schory agreed not to institute a foreclosure action if Francis remained current on certain negotiated payments. As additional consideration for this new arrangement/agreement, Francis signed the May 1, 1991 letter. However, Francis failed to abide by the terms of the new agreement, defaulting on payments owed to Schory.

{¶ 52} Clearly, the actions of Schory did not constitute malicious prosecution or abuse of process. Even if Schory's ulterior purpose in requesting that Francis write the May 1, 1991 letter was to prevent Francis from being able to

discharge the debt owed to Schory in a bankruptcy proceeding, that purpose was entirely proper. The letter was incorporated into the settlement agreement. Francis was not coerced to write the letter. We believe the court of appeals was absolutely correct in concluding that Francis was "'the architect of his own continuous mortification.'"

**{¶ 53}** Therefore, we find that summary judgment was properly granted in favor of Schory on these claims. Furthermore, we also find that summary judgment was properly granted in favor of Schory on Francis's claim for intentional infliction of severe emotional distress.

III

Conclusion

**{¶ 54}** Keeping in mind the principles set forth in Civ.R. 56, we find that Society (and Reiber) and Schory (and Shory & Sons) are entitled to summary judgment on all claims asserted against them by Francis. The judgment of the court of appeals is affirmed in part and reversed in part.

*Judgment affirmed in part*

*and reversed in part.*

MOYER, C.J., SLABY, O'DONNELL, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

LYNN C. SLABY, J., of the Ninth Appellate District, sitting for WRIGHT, J.

TERRENCE O'DONNELL, J., of the Eighth Appellate District, sitting for Resnick, J.

_____