OPINION
{¶ 1} Appellant Cheryl Clemens appeals from a judgment and decree of divorce. Cheryl contends that the trial court erred in setting a de facto termination date of the marriage.[1] She also contends that the trial court erred in failing to award spousal support and in dividing a personal savings plan. Finally, Cheryl contends that the trial *Page 2 
court erred in disregarding an agreement of the parties on depletion of a personal savings account.
 {¶ 2} We conclude that the trial court did not abuse its discretion in establishing a de facto termination date for the marriage. Under the circumstances of the case, the result was equitable. The trial court also did not abuse its discretion in refusing to award spousal support or in dividing the assets in the personal savings plan. The court's decision was not arbitrary or unreasonable, and it was supported by the evidence. We also conclude that the trial court erred in stating that separation agreements must be in writing. However, the error was not prejudicial. A party asserting the existence of an oral separation agreement has the burden of providing clear and convincing evidence of the agreement, but no such evidence was presented. Accordingly, the judgment of the trial court is Affirmed.
I
 {¶ 3} Cheryl and William Clemens were married in February 1980, and continued to live as husband and wife until Cheryl left the marital premises in November 2001. During the marriage, Cheryl worked as a realtor and William was employed by Delco Products, which subsequently became Delphi Corporation. William was employed by Frigidaire Corporation between February 1977, and March or April 1979, when Frigidaire closed. He was then hired at Delco in September 1979, and worked there until he eventually retired in December 2005, by taking advantage of an early retirement incentive that added two years to his existing 28 years of service.
 {¶ 4} In 1990, William began contributing to a Personal Savings Plan (PSP), *Page 3 
which was like a 401-K. During the marriage, the parties took loans from the PSP to make repairs and finish items in the marital home, and to pay taxes. During 2002 through 2004, William withdrew approximately $69,000 from the PSP, and the withdrawals were reported and taxed on his federal income tax returns. William testified that about $60,000 of this amount was taken for hardship purposes, to pay property taxes, homeowner's insurance, income tax, and amounts related to foreclosure. When William retired, the loans were paid off, and the most recent statement at the time of the divorce hearing showed a balance of $34,302.60.
 {¶ 5} Cheryl testified that when the parties began living separately, they agreed that William and the children could remain in the marital home and that William would take care of the bills.[2] Cheryl also indicated that the parties agreed that she would not ask for spousal or child support as long as William did not use the PSP. Cheryl also testified that William said he would help her with income taxes as long as she did not ask for spousal or child support. William helped her with taxes in 2001, but refused to help after that time. William testified that no such agreement was made.
 {¶ 6} Cheryl did not file for divorce until December 2005. In late 2003 or early 2004, Cheryl began living with her boyfriend, Thomas Fernandez, at a home Fernandez *Page 4 
owned in Fairborn, Ohio. Cheryl was still living there at the time of the divorce hearing. She claimed that she paid Fernandez $600 per month in rent, but had no receipts to document the expense. She also drove an auto that Fernandez owned. She paid for her gasoline and her own phone bill, which she used for business, and for dining-out expenses, which were mainly business-related.
 {¶ 7} About eight months before the divorce hearing, Cheryl began depositing her commissions into Fernandez's bank account. She had no access to that account, but asked Fernandez to make withdrawals when she needed money. Cheryl claimed that she had no money in the account at the time of the hearing. She also indicated that she closed her checking account and deposited her commissions in Fernandez's account due to a court judgment against her and attempts to tie up the funds in her own account.
 {¶ 8} Cheryl also owed the Internal Revenue Service about $23,471 for 2004 and 2005 taxes, because she did not pay any estimated quarterly payments on her income during those years. In addition, she owed the Ohio Department of Taxation approximately $1,779. Cheryl's gross income from her realty business was $70,995 in 2003, $93,414 in 2004, and $82,334 in 2005. Her total income, after deducting business expenses, was $36,543 in 2003; $52,475 in 2004; and $38,769 in 2005. Cheryl testified at the divorce hearing that her gross income was $53,056 through July 2006, and after deductions for expenses, was approximately $24,966.
 {¶ 9} William's gross income for the years in question was $101,646 in 2003, $100,366 in 2004, and $89,330 in 2005. However, the evidence in the record shows substantial deductions from William's income for PSP loan payments and first and *Page 5 
second mortgages on the marital home. William also was in retirement status at the time of the divorce hearing.
 {¶ 10} William continued to live in the marital premises until Cheryl asked him to move out so that the home could be sold. Between November 2001, and the closing on the sale in June 2006, William made payments on both the first and second mortgages, which were substantial. Cheryl made one or two house payments because the property was in foreclosure, and she was reimbursed for this at closing. She was also reimbursed for repairs she had made to the premises, but refused to pay William for repairs he had made to the home. In addition, Cheryl received $7,357.50 from the sale proceeds as a realtor's commission, before any amount was distributed to the parties. The net amount of proceeds, after deduction for the first and second mortgages, delinquent property taxes and other expenses of sale, was approximately $59,325.
 {¶ 11} After William retired in 2005, his monthly pension, before deduction of Cheryl's marital portion, was $2,943 per month. This was his only source of income, other than work he performed in his brother's construction business. In lieu of a salary, William's brother allowed him to live rent-free at a house the brother owned.
 {¶ 12} At the time of the hearing, William was 50 years old and Cheryl was 48 years of age. Cheryl claimed that she had trouble getting out and working after having colon surgery in January 2006. She also presented a "medical note" from her family doctor, dated several days before the divorce hearing. This note stated that Cheryl was to be off work between August 28, 2006, and November 1, 2006, for unspecified reasons.
 {¶ 13} After hearing the testimony, the trial court allowed William to be *Page 6 
reimbursed in the amount of $5,465.57 for repairs and expenses for the marital premises before the property was sold. The court attributed $13,000 in earned income to William per year, based on $4,000 he had earned, plus $750 per month in free rent. The court concluded that spousal support would be inappropriate, because Cheryl had higher earning ability, had financial benefits from co-habitation with an unrelated adult male, and had been gainfully employed before and after the separation.
 {¶ 14} Cheryl was awarded 50% of the coverture fraction, which amounted to 37.5% of William's pension. She was also awarded 37.5% of the PSP. The court ordered William to pay Cheryl $841.33 per month as her share of the pension and 37.5% of the $34,302.60 in the PSP account. The court had previously ordered that the money from the sale of the house be divided equally between the parties. Cheryl appeals from the judgment.
 II {¶ 15} Cheryl's First Assignment of Error is as follows:
 {¶ 16} "THE TRIAL COURT ERRED IN SETTING A DE FACTO DATE OF NOVEMBER 1, 2001 FOR THE TERMINATION OF THE MARRIAGE AND FOR MARITAL PROPERTY VALUATION."
 {¶ 17} Under this assignment of error, Cheryl contends that the trial court erred in choosing November 1, 2001, as the termination date of the marriage, rather than the date of the judicial termination of the marriage. According to Cheryl, equity weighs against using the earlier date, because William continued to carry her on his health insurance after the separation, she did not seek spousal or child support even though *Page 7 
her minor child resided with her as much as he did with his father, and she did not begin to live with her boyfriend until 2004. Cheryl also contends that the trial court did not consistently use the November 1, 2001 date, because the court valued the PSP as of June 30, 2006, when it was worth less.
 {¶ 18} We review trial court decisions on division of property for abuse of discretion, which occurs when a decision is "unreasonable, arbitrary, or unconscionable." Kapp v. Kapp, Clark App. No. 2003-CA-9.2005-Ohio-6830, at ¶ 21, citing Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 19} R.C. 3105.171(A)(2) defines "during the marriage" as the time from the date of the marriage through the date of the final hearing. If the court finds that using either of these dates would be inequitable, the court may select dates that it considers "equitable" in determining marital property. In Berish v. Berish (1982), 69 Ohio St.2d 318,432 N.E.2d 183, the Ohio Supreme Court stressed that:
 {¶ 20} "Equity may occasionally require valuation as of the date of the de facto termination of the marriage. The circumstances of a particular case may make a date prior to trial more equitable for the recognition, determination and valuation of relative equities in marital assets.
 {¶ 21} "* * *
 {¶ 22} "In order to do equity, a trial court must be permitted to utilize alternative valuation dates, such as the time of permanent separation or de facto termination of the marriage, where reasonable under the facts and circumstances presented in a particular case. In this fashion, the trial court will have the necessary flexibility to exercise its discretion in making truly equitable awards consistent with legitimate expectations of the *Page 8 
parties." 69 Ohio St.2d at 320-21.
 {¶ 23} Cheryl cites Gerrard v. Gerrard (June 16, 1989), Clark App. No. 2493, 1989 WL 68455, to support the contention that the trial court improperly focused on the fact that she unilaterally vacated the marital residence in November 2001. In Gerrard, we noted that courts are permitted to use a de facto termination date rather than the de jure termination date of the marriage for purposes of valuing property. However, we found the de facto date in that case to be improper because:
 {¶ 24} "[T]he husband, unilaterally, vacated the marital residence in November, 1985. There was no separation agreement or other form of bilateral agreement to then divide property. Though the husband continued to provide the wife some measure of support, the parties tended to be self-supporting. Against a marital history of thirty years, these facts alone are not sufficient to support a finding of de facto termination of the marriage and a division of property at that point in time." Id. at * 2.
 {¶ 25} In the present case, the trial court did not rely solely on Cheryl's "unilateral" decision to leave home. The court also focused on the fact that the parties had made no attempts to reconcile or cohabit, and had maintained separate business accounts and activities since November 2001. Furthermore, the present case differs significantly from the situation in Gerrard. There was no indication in Gerrard that one spouse had cohabited or had shared living expenses for a number of years with another party. The husband in Gerrard had also continued to share expenses for the marital home and pay support to his spouse. Therefore, an earlier valuation date would have been inequitable and would not have adequately protected his interests. In contrast, Cheryl did not regularly help maintain the family home, other than making a payment or two after *Page 9 
William had moved out at her request and the home was being foreclosed and sold. These payments were not indicia that the marital relation still existed; they were a temporary measure to prevent a foreclosure action against a valuable asset.
 {¶ 26} Ohio courts have stressed that "equitable considerations, not any flat rule, dictate the court's determination of a date prior to trial for the purpose of recognizing and valuing marital assets."Day v. Day (1988), 40 Ohio App.3d 155, 157, 532 N.E.2d 201. Therefore, the trial court would have erred if it had relied solely on Cheryl's unilateral decision to leave home. As we noted, however, this was not the case.
 {¶ 27} Furthermore, the trial court benefitted Cheryl by valuing the marital home at a later date for purposes of dividing the equity. Cheryl received the benefit of any increase in value between November 2001 and the closing, which occurred nearly four years later. She also received the benefit of any increase in equity resulting from payments William made during that time span, even though she did not contribute to payment of either the first or second mortgage that existed on the property, or the payment of property taxes and upkeep. Cheryl's share may have been considerably less if the trial court had valued the home as of November 1, 2001, or had deducted William's payments of principal and taxes between the time the parties separated and the date of the sale.
 {¶ 28} Cheryl also argues that the trial court inconsistently valued the PSP by using the date of June 30, 2006, rather than November 1, 2001, when the balance of the fund was far greater. However, this argument fails to consider several points. According to the exhibits, William's Delphi Corporation PSP was opened on May 27, 1999, with the purchase of 3,411.742 shares/units at a total price of $45,145.93. At that *Page 10 
time, the price was approximately $13.12 per share.[3] The purchase price was funded by a transfer in of funds from William's prior PSP with General Motors Corporation.
 {¶ 29} The Delphi PSP was like a 401-K, and initial contributions were not included in taxable income on William's paycheck. Between May 27, 1999 and November 1, 2001, weekly repayments of existing and new loans on the PSP were deducted from William's paycheck. William also made contributions to the PSP during this time. The total amount of the repayments and contributions was about $49,000. However, during the same time period, William and Cheryl took about $44,200 in loans from the account. Therefore, if the trial court had valued the account as of November 1, 2001, the balance would have been approximately $49,945. The trial court ultimately awarded Cheryl 37.5% of the PSP, which would have given her a recovery as of that valuation date, of approximately $18,729. The PSP was valued at about $34,302.60 as of June 30, 2006. Cheryl received approximately $12,863, or about $5,866 less than she would have received under the earlier valuation date of November 1, 2001. However, this difference does not mean that the court abused its discretion. As we mentioned, William continued to make loan payments after the date of separation and Cheryl did not contribute. Although William withdrew $69,100 from the PSP between November 2001 and January 2006, and took an additional $15,000 in loans, he also repaid more than $48,234 into the account.
 {¶ 30} More importantly, the amounts withdrawn from the PSP after November 2001, were used to pay Cheryl's taxes, and for repairs, taxes, and upkeep on the marital *Page 11 
home. They were also used to increase marital equity in the home, as the trial court noted. And finally, William reported the withdrawals as income on his tax return and paid taxes. Again, Cheryl did not pay any part of this liability.
 {¶ 31} Cheryl also received the benefit of increases in the value of the share/unit price. The share/unit price on November 2, 2001, was about $15.21, but had increased to $19.27 by June 30, 2006, when the trial court valued the account. As an additional matter, we note that the trial court awarded Cheryl $4,000 in a Prudential account that she owned and did not award William any part of the account.
 {¶ 32} Loans and withdrawals from the PSP account arguably may have resulted in Cheryl's ultimate recovery of a somewhat smaller amount, but this is not specifically established by the record. Accordingly, the trial court's use of a later valuation date is not unreasonable or arbitrary and may have actually benefitted Cheryl, since she did not have to report the early withdrawals as income.
 {¶ 33} We conclude that the trial court did not abuse its discretion in using a de facto termination date for the marriage. Under the circumstances of this case, the result was equitable.
 {¶ 34} Cheryl's First Assignment of Error is overruled.
 II {¶ 35} Cheryl's Second Assignment of Error is as follows:
 {¶ 36} "THE TRIAL COURT ERRED IN ITS DETERMINATION THAT NO SPOUSAL SUPPORT SHOULD BE AWARDED."
 {¶ 37} Cheryl contends under this assignment of error that the trial court's *Page 12 
analysis of the factors pertaining to awards of spousal support was flawed. In particular, Cheryl asserts that the trial court erred in determining William's earned income and failed to properly consider Cheryl's serious health issues and the lengthy duration of the marriage. Cheryl also contends that the trial court failed to consider that she will not have health insurance coverage as a result of the divorce.
 {¶ 38} "We review a trial court's decision to award spousal support only for an abuse of discretion. * * * A trial court abuses its discretion when it makes a decision that is unreasonable, arbitrary, or unconscionable." Davis v. Davis, Montgomery App. No. 20364.2005-Ohio-670, at ¶ 11 (citations omitted).
 {¶ 39} After reviewing the record and the trial court's decision, we find no abuse of discretion. Under R.C. § 3105.18(C)(1), trial courts are to consider the following factors in deciding if spousal support is appropriate and reasonable:
 {¶ 40} "(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
 {¶ 41} "(b) The relative earning abilities of the parties;
 {¶ 42} "(c) The ages and the physical, mental, and emotional conditions of the parties;
 {¶ 43} "(d) The retirement benefits of the parties;
 {¶ 44} "(e) The duration of the marriage;
 {¶ 45} "(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home; *Page 13 
 {¶ 46} "(g) The standard of living of the parties established during the marriage;
 {¶ 47} "(h) The relative extent of education of the parties;
 {¶ 48} "(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
 {¶ 49} "(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 {¶ 50} "(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 {¶ 51} "(l) The tax consequences, for each party, of an award of spousal support;
 {¶ 52} "(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 {¶ 53} "(n) Any other factor that the court expressly finds to be relevant and equitable."
 {¶ 54} The trial court separately considered each of the above factors and concluded that spousal support was not warranted. A number of the factors were not relevant: no minor children were involved; the parties have equal education; and both parties worked outside the home for many years before and after the separation.
 {¶ 55} With regard to William's income, the trial court was not required to impute income, because there was no evidence that William retired to avoid support obligations. Perry v. Perry, Clark App. No. 07-CA-11, 2008-Ohio-1415, at ¶ 25. In *Page 14 Perry, we noted that:
 {¶ 56} "Before imputing income to a retired party, the trial court must make a finding that the retired party's decision to retire was based on an intent to defeat an award of spousal support. * * * If there is no evidence of a purpose to escape an obligation of spousal support and the decision to retire appears reasonable under the circumstances, then the trial court should not impute additional income to the retired party." Id. (citations omitted).
 {¶ 57} The evidence in this case indicates that William was offered early retirement because his employer, Delphi, had filed for Chapter 11 bankruptcy. Under the circumstances, William acted prudently in accepting two extra years of employment so that he would be eligible for retirement. Furthermore, the trial court attributed $13,000 in income to William, based on the fact that he received free housing in exchange for working for his brother's construction business, and that he earned $4,000 for cleaning condominiums. This was not imputed income; it was an estimate of income that William actually earned, but did not receive totally in cash.
 {¶ 58} The trial court did also consider Cheryl's health, by noting that she had jaw and intestinal difficulties. The court was not required to believe Cheryl's self-serving testimony that she was unable to work, nor did it have to give weight to a physician's note, dated just days before the initial divorce hearing, which excused Cheryl from work for two months for unspecified reasons. "Credibility determinations are best left to the judgment of the trial court. * * * Trial courts, unlike reviewing courts, are in a position to view the witnesses and to assess their credibility in light of such nuances as the witness' body language and demeanor." Merrick v. Merrick (May 2, 1997), Montgomery App. *Page 15 
No. 15777, 1997 WL 216583, * 6. Notably, Cheryl's health issues did not prevent her from earning approximately $53,000 in real estate commissions between January and July 2006, even though she had undergone surgery during that period of time. Cheryl did claim that she had difficulty working due to intestinal issues. Again, the trial court did not have to believe her testimony.
 {¶ 59} Furthermore, while the parties in the present case had a lengthy marriage, that factor is not controlling. We have previously indicated that the "duration of the parties' marriage could justify a spousal support order, but only if a need for spousal support is demonstrated. That need contemplates not only the financial demands a former spouse has, but also her capacity to meet those demands from her own resources, as well as the ability of the other former spouse to provide assistance in meeting those needs." Perry, 2008-Ohio-1315, at ¶ 29.
 {¶ 60} We have also commented that "an equitable concept in assessing spousal support, is the benefit an individual receives from sharing expenses with another." Mandelbaum v. Mandelbaum, Montgomery App. No. 21817, 2007-Ohio-6138, at ¶ 95, n. 5 (observing that "`the ability to share expenses is relevant in deciding whether an obligor's claim of poverty is well-taken.'") (Citations omitted).
 {¶ 61} As the trial court noted, Cheryl was gainfully employed before and after the separation, and receives financial benefit by cohabiting with a male who furnishes her with a place to live and an automobile. She also has received, and will continue to receive, her coverture fraction of William's pension.
 {¶ 62} Finally, health benefits were not discussed at length during the divorce hearing, and the trial court was not statutorily required to consider this as a factor. *Page 16 
Cheryl did not present evidence that she is incapable of purchasing health insurance or that she had been turned down for coverage. Accordingly, the trial court did not abuse its discretion in refusing to award spousal support.
 {¶ 63} Cheryl's Second Assignment of Error is overruled.
 IV {¶ 64} Cheryl's Third Assignment of Error is as follows:
 {¶ 65} "THE TRIAL COURT ERRED IN ITS DIVISION OF THE PERSONAL SAVINGS PLAN."
 {¶ 66} Under this assignment of error, Cheryl contends that the trial court made certain erroneous factual findings in dividing the PSP account, including the findings that Cheryl did not financially support her minor child while in high school and that the incomes of the parties were in parity. Cheryl also contends that the court erred in using a coverture fraction to divide the savings account because deposits were not made into the account until after the parties were married.
 {¶ 67} "A domestic relations court is required, when granting a divorce, to equitably divide and distribute the marital property between the parties. * * * When dividing marital property, the trial court must divide it equally between the parties unless an equal division would be inequitable. * * * In determining what is an equitable division of the marital property, the court must consider `all relevant factors,' including those found in R.C. 3105.171(F)." Kestner v. Kestner,173 Ohio App.3d 632, 637, 2007-Ohio-622, 879 N.E.2d 849, at ¶ 10 (citations omitted). We review division of property for abuse of discretion.Kapp, 2005-Ohio-6830, at ¶ 21. *Page 17 
 {¶ 68} The factors in R.C. 3105.171(F) include:
 {¶ 69} "(1) The duration of the marriage;
 {¶ 70} "(2) The assets and liabilities of the spouses;
 {¶ 71} "(3) The desirability of awarding the family home, or the right to reside in the family home for reasonable periods of time, to the spouse with custody of the children of the marriage;
 {¶ 72} "(4) The liquidity of the property to be distributed;
 {¶ 73} "(5) The economic desirability of retaining intact an asset or an interest in an asset;
 {¶ 74} "(6) The tax consequences of the property division upon the respective awards to be made to each spouse;
 {¶ 75} "(7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;
 {¶ 76} "(8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses;
 {¶ 77} "(9) Any other factor that the court expressly finds to be relevant and equitable."
 {¶ 78} The trial court considered the pertinent factors, but found most relevant the fact that William continued to pay on the PSP account after separation, that Cheryl failed to contribute, that the parties' incomes were in parity, that withdrawals from the account were used to pay liens, taxes, and other martial obligations, and that Cheryl did not financially contribute to the support of the parties' minor child. The record supports these findings. *Page 18 
 {¶ 79} As to Cheryl's argument that the parties' incomes were not in "parity" at the time, we agree that William's gross income was higher "on paper." However, his pay stubs indicate that he had very little net income after deductions were made for the PSP loans, taxes, and the second mortgage on the house. For example, William's stub for the week of January 13, 2002, shows gross pay of $837.60. After deduction of taxes, payment of a second mortgage on the house in the amount of $251, and five PSP loans totaling $260.25, William's net pay was $117.81. Another paycheck during the same time period shows a gross of $1,354 due to overtime, a shift premium, and other factors, and a net weekly pay of only $417.82.
 {¶ 80} The evidence indicates that William continued to pay the PSP loans for several years after the separation, without contribution from Cheryl. He also paid substantial first and second mortgages on the marital home, again without contribution from Cheryl. Cheryl also did not pay child support other than for a period of three months, when she was ordered to so during a divorce action that William filed in 2004.
 {¶ 81} As a final matter, the PSP account was like a retirement account, in that the contributions were made on a pre-tax basis, subject to taxation later, upon withdrawal. Therefore, we see no abuse of discretion in the trial court's choice to award a larger share of the PSP to William. The court's discussion indicates that its decision was based on equitable reasons.
 {¶ 82} Cheryl's Third Assignment of Error is overruled.
 V {¶ 83} Cheryl's Fourth Assignment of Error is as follows:
 {¶ 84} "THE TRIAL COURT ERRED IN COMPLETELY DISREGARDING THE *Page 19 
PARTIES' AGREEMENT THAT WILLIAM WOULD NOT UNILATERALLY DEPLETE THE SAVINGS ACCOUNT."
 {¶ 85} Under this assignment of error, Cheryl contends that the trial court failed to resolve a factual dispute on an alleged oral agreement about the PSP. According to Cheryl, William agreed orally not to unilaterally deplete the PSP. Referring to page 12 of the trial court decision, Cheryl argues that the court avoided resolving the issue by erroneously concluding that intentions not expressed in writing have no existence and may not be proven by parol evidence. Cheryl also contends that the trial court erred in finding that separation agreements must be reduced to writing. As a result, Cheryl contends that the trial court erred in dividing the parties' assets.
 {¶ 86} However, the part of the trial court decision that Cheryl references relates to $25,251.22 in tax liabilities that Cheryl owed, not to division of the PSP. The trial court noted Cheryl's testimony that William had agreed to pay her tax liability from the PSP during separation, and William's denial that he had agreed to do so. The court concluded that the only evidence of this alleged agreement was Cheryl's testimony. The court then stated that intentions not expressed in writing have no existence and may not be shown by parol evidence. In addition, the court stated that under Ohio law, separation agreements must be in writing. Judgment Entry and Final Decree of Divorce, p. 12. Accordingly, the court ordered that each party would be solely responsible for debt incurred after the November 2001 separation.
 {¶ 87} As a preliminary matter, we agree that the trial court erred in relying on the parol evidence rule, because the rule does not apply. InEd Schory Sons, Inc. v. Soc. Natl. Bank, 75 Ohio St.3d 433, 440,1996-Ohio-194, 662 N.E.2d 1074, the Ohio *Page 20 
Supreme Court noted that:
 {¶ 88} "The Parol Evidence Rule was developed centuries ago to protect the integrity of written contracts.' * * * The parol evidence rule is a rule of substantive law that prohibits a party who has entered into a written contract from contradicting the terms of the contract with evidence of alleged or actual agreements. * * * `When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.'" 75 Ohio St.3d at 440 (citations omitted).
 {¶ 89} Because the parties in the present case did not reduce any contract to writing, the parol evidence rule would not apply and would not have been a proper basis for rejecting testimony about an oral contract.
 {¶ 90} The trial court also incorrectly held that Ohio law only allows written separation agreements. R.C. § 3103.06 provides that:
 {¶ 91} "A husband and wife cannot, by any contract with each other, alter their legal relations, except that they may agree to an immediate separation and make provisions for the support of either of them and their children during the separation."
 {¶ 92} In Pawlowski v. Pawlowski (1992), 83 Ohio App.3d 794, 797,615 N.E.2d 1071, the Tenth District Court of Appeals noted that R.C. 3103.06
does not differentiate between oral and written agreements. The Tenth District, therefore, concluded that the statute, on its face, does not bar oral agreements. Id. The Tenth District noted that:
 {¶ 93} "Having a written agreement or a written memorandum initialed by the *Page 21 
parties reflecting the agreement is far preferable to an oral agreement. However, an oral agreement is possible and can be enforced by the court in those circumstances where the terms of the agreement can be established by clear and convincing evidence."83 Ohio App.3d at 798-799.
 {¶ 94} "Clear and convincing evidence is that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469, 120 N.E.2d 118, at paragraph three of the syllabus.
 {¶ 95} In Pawlowski, the existence of an agreement was established by the required proof, which included: (1) the wife's testimony that a settlement agreement had been reached; (2) the fact that the husband had entered into a wedding ceremony with another woman after a hearing where the parties informed the court of their agreement and that an entry would be forthcoming; (3) the parties' exchange of personal property in compliance with the agreement; and (4) testimony from the husband's former attorney that an agreement had been reached during the time that he represented the husband. 83 Ohio App.3d at 797-798.
 {¶ 96} A binding oral agreement was also found where a husband had agreed under oath during a deposition to the terms of a settlement agreement and a transcript of the deposition was filed with the trial court. Shetler v. Shetler (May 23, 2001), Wayne App. No. 00CA0070,2001 WL 542318, * 2. Accord, Campbell v. Buzzelli, Medina App. No. 07CA0048-M, 2008-Ohio-725, at ¶ 10 (finding clear and convincing evidence of an *Page 22 
oral agreement where the transcript of a court hearing indicated that the parties to the case went though each side's proposed journal entries on the record and resolved each difference between the entries). See, also, Maulis v. Maulis (July 18, 1997), Portage App. No. 96-P-0190,1997 WL 469787, * 1 (finding clear and convincing evidence of an oral agreement where the parties' testimony agreed as to the terms of their arrangement).
 {¶ 97} The above cases contain a common element — some corroboration of the the claim of the party asserting an oral agreement. No corroborating evidence was submitted in the present case. In fact, the evidence in the record tends to substantiate William's denial of any agreement.
 {¶ 98} As was noted, William did use PSP funds in 2002 to pay Cheryl's tax liability. However, that does not prove an agreement of the type Cheryl mentioned. This would be a logical and reasonable course of action, since the parties had lived together for most of 2001, and had filed a joint tax return in 2002. Thereafter, the parties lived apart and filed separate tax returns.
 {¶ 99} Cheryl testified that when she asked William for help with her taxes after 2002, he refused. More importantly, however, Cheryl would have been aware of William's breach of the alleged agreement when she filed her 2002 and 2003 tax returns. Despite this awareness, Cheryl failed to take any action to enforce the agreement. Cheryl could have filed a divorce action and could have requested restraining orders and enforcement of the alleged agreement. She did not do so.
 {¶ 100} Cheryl would also have been aware of William's alleged breach when she filed her 2004 tax return. For that taxable year, which ended December 31, *Page 23 
2004, Cheryl grossed $93,414, and had a total income of $52,475 after business deductions. Cheryl failed to make any estimated tax payments for that year, and, therefore, owed $15,501 to the IRS and $1,779 to the Ohio Department of Taxation. These were sizeable deficiencies, and logic would dictate that if an agreement existed, Cheryl would have taken action to enforce the agreement. Cheryl failed to take any action.
 {¶ 101} Cheryl did not file a divorce action until December 2005, which would have been considerably past the due date of her 2004 taxes. When she did file for divorce, she simply requested, and obtained, generic restraining orders, which were granted to both sides. During the nine months that the action was pending before the final divorce hearing in September 2006, Cheryl also did not ask the trial court to grant relief under the alleged oral agreement. Cheryl would have been aware prior to that time that she owed $9,776 on her 2005 taxes, which were due in April 2006. As in 2004, Cheryl had failed to make any estimated tax payments, despite earning $82,334 in gross income in 2005.
 {¶ 102} Accordingly, even though the trial court erred in concluding that separation agreements must be in writing, the decision rejecting the oral agreement was correct. See, e.g., Reynolds v. Budzik (1999),134 Ohio App.3d 844, 846, n. 3, 732 N.E.2d 485 ("when a trial court has stated an erroneous basis for its judgment, an appellate court must affirm the judgment if it is legally correct on other grounds, that is, it achieves the right result for the wrong reason, because such an error is not prejudicial.") Cheryl had the burden of proof, because she was the party asserting the existence of an oral agreement. Matter of Estateof Bowman (Dec. 28, 1992), Warren App. *Page 24 
No. CA92-04-037, 1992 WL 389768, * 1, and Mattlin-Tiano v. Tiano (Jan. 9, 2001), Franklin App. No. 99AP-1266, 2001 WL 15625, * 2. However, the evidence Cheryl submitted did not meet the clear and convincing standard that Ohio courts have required for validating oral separation agreements.
 {¶ 103} Furthermore, even if William had agreed not to deplete the PSP unilaterally, the evident purpose of the agreement would be to prevent William from using the PSP funds for purposes of his own, with no benefit to Cheryl. As previously noted, the record indicates that William used the PSP funds to benefit both parties by preserving marital property. Therefore, it appears that even if William had agreed not to make expenditures out of the PSP, and breached his agreement, Cheryl was not damaged as a result.
 {¶ 104} We also note that the trial court's allocation of debt is consistent with the de facto termination of the marriage as of November 1, 2001. The court held that the parties would be responsible for debts they had individually incurred after the date of separation. The trial court, therefore, did not act unreasonably or arbitrarily in failing to require William to pay income taxes that Cheryl incurred after the date of separation.
 {¶ 105} Cheryl's Fourth Assignment of Error is overruled.
 VI {¶ 106} All of Cheryl's assignments of error having been overruled, the judgment of the trial court is Affirmed. *Page 25 
WOLFF, P.J., and BROGAN, J., concur.
Copies mailed to:
Richard Hempfling
Anthony J. Zaharieff
Hon. Steven L. Hurley
[1] For purposes of convenience, we will refer to the parties by their first names.
[2] At the time of separation, only one of the parties' three children was under 18. By the time the divorce action was filed, none of the children were minors.
[3] For purposes of convenience, the PSP figures will be rounded to approximate amounts. The actual share price in May 1999, for example, was $13.117173. *Page 1